UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

DANIELLE ELIZABETH OSBORN,

Plaintiff,

v.

CAROLYN W. COLVIN,

Defendant.

Case No. 15-cv-03599-LB

**ORDER GRANTING IN PART AND DENYING IN PART THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT; REMANDING CASE FOR FURTHER PROCEEDINGS**

Re: ECF Nos. 14 & 23

## INTRODUCTION

The plaintiff, Danielle Elizabeth Osborn, suffers from lumbar degenerative-disc disease, depression, anxiety, and obesity.[1] Ms. Osborn seeks judicial review of the Social Security Administration's final decision denying her disability benefits.[2] The Administrative Law Judge ("ALJ") found that Ms. Osborn's lumbar degenerative-disc disease, exacerbated by obesity, was a severe impairment but declared Ms. Osborn not disabled and denied Social Security Income ("SSI") benefits.[3] Ms. Osborn now moves for summary judgment.[4] Carolyn Colvin, the Social

---

[1] Motion for Summary Judgment — ECF No. 14; Administrative Record ("AR") 84. Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] *Id.*

[3] AR 24, 26, 32.

[4] Motion for Summary Judgment.

Security Commissioner ("Commissioner"), opposes the motion and cross-moves for summary judgment.[5]

The court deems the matter submitted for decision without oral argument. N.D. Cal. Civ. L.R. 16-5. All parties have consented to this court's jurisdiction.[6] The court grants in part and denies in part Ms. Osborn's motion for summary judgment, and grants in part and denies in part the Commissioner's cross-motion, because the ALJ did not err by giving less weight to Dr. Marion-Isabel Zipperle's consultative examining opinion, but did err by (1) giving less weight to Dr. Jackson and Nurse Practitioner Laura McDonald's co-authored lumbar spine residual-functional-capacity assessment, and (2) discrediting Ms. Osborn's testimony.

## STATEMENT

### 1. Procedural History

On June 7, 2011, Ms. Osborn filed an application for Title II Disability Insurance Benefits and Title XVI Supplemental Security Income, alleging a disability onset date of December 1, 2006.[7] The Social Security Administration ("Administration" or "SSA") initially denied her applications and again upon reconsideration.[8] Ms. Osborn filed a timely "Request for Hearing by Administrative Law Judge" on April 22, 2012.[9]

Administrative Law Judge Amita B. Tracy (the "ALJ") held an initial hearing on January 17, 2013, where Ms. Osborn, her non-attorney representative Dan McCaskell, and vocational expert Gene Johnson were present.[10] At this hearing, the ALJ questioned all parties present; Ms. Osborn and Mr. Johnson testified as to her alleged disability.[11] The ALJ held a supplemental hearing on

---

[5] Cross-Motion for Summary Judgment — ECF No. 23.

[6] Consent Forms — ECF Nos. 6, 9.

[7] AR 278-87, 288-94.

[8] *Id.* at 110-35, 138-61.

[9] *Id.* at 185-86.

[10] *Id.* at 77-109.

[11] *Id.*

United States District Court
Northern District of California

September 5, 2013, where Ms. Osborn, Mr. McCaskell, and medical expert William Alexander Rack were present.[12] The ALJ again questioned all parties present; Ms. Osborn and Mr. Rack testified as to her alleged disability.[13]

The ALJ issued an order in December 2013 denying benefits and finding Ms. Osborn not disabled.[14] She appealed that decision to the Appeals Council the following January.[15] The Appeals Council denied that request for review in June 2015.[16]

Two months later Ms. Osborn timely sought judicial review of the final decision denying her SSI benefits.[17] The Commissioner answered the complaint in December, and Ms. Osborn filed her motion for summary judgment in January 2016.[18] The Commissioner filed an opposition and cross-motion for summary judgment in April.[19]

## 2.  Summary of Record and Administrative Findings

### 2.1  Medical Records

This section chronologically summarizes Ms. Osborn's relevant medical visits during the specified time period with health care providers. These visits were for her alleged disabilities stemming from lumbar degenerative-disc disease, depression, anxiety, and obesity.

#### 2.1.1  Medical records from 2005

On October 12th, Ms. Osborn had two medical visits. The Healdsburg District Hospital emergency department saw Ms. Osborn for pelvic pain, diarrhea, nausea and dizziness.[20] Dr. Paris

---

[12] *Id.* at 39-76.

[13] *Id.*

[14] *Id.* at 20-37.

[15] *Id.* at 19.

[16] *Id.* at 1-7.

[17] Complaint — ECF No. 1.

[18] Answer — ECF No. 12; Motion for Summary Judgment.

[19] Cross-Motion for Summary Judgment; Reply — ECF No. 24.

[20] AR 479-481.

prescribed her Doxycycline, and reported her demeanor as alert, not in distress, and cooperative.[21] An unidentified medical provider at Alliance Medical Center ("Alliance") saw Ms. Osborn that same day for a post-emergency room follow-up visit.[22] The report reflected that Ms. Osborn was suffering from depression symptoms: "tired, [fluctuating] moods, crying, [more] sleeping, [fluctuating] appetite."[23] It also revealed that the emergency department prescribed her Vicodin and Doxycycline.[24] It concluded with the diagnosis that Ms. Osborn's physical symptoms probably stemmed from residual pelvic pain or infection, and it prescribed her Prozac.[25]

Ms. Osborn had two Alliance medical reports in November. The first showed that Ms. Osborn missed her appointment on the November 2 for depression and obesity.[26] On November 11, an unidentified medical provider reported that she had completed her antibiotics from the emergency department visit the month prior, had no more stomach pain, and was low on Prozac.[27] Also, when Ms. Osborn was asked for a urine analysis, "she took the cup and left the clinic."[28]

### 2.1.2  Medical records from 2007

Ms. Osborn had many medical visits at various hospitals and clinics in 2007. Alexander Valley Regional Medical Center physicians treated Ms. Osborn from January 12, 2007 to June 29, 2010 for a variety of medical issues including pregnancy via Caesarean section, chronic lower-back pain, bronchitis, depression, anxiety, and obesity.[29]

A January 2007 progress note reported that Ms. Osborn was "very angry, yelling and blaming [the] clinic for not following the on call and OB tests and medications."[30]

---

[21] *Id.*

[22] AR 451.

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] AR 450.

[27] AR 449.

[28] *Id.*

[29] AR 415-44.

[30] AR 433.

United States District Court
Northern District of California

The next month, examining physician Dr. David Gorchoff noted that Ms. Osborn had a recent Caesarean section and gave birth to a healthy newborn male.[31] He included that Ms. Osborn "moved wrongly" two days ago and somehow wrenched her back, causing her diffuse lower-back pain.[32] He observed Ms. Osborn to be in general mild distress, walking with obvious discomfort, and having diffuse tenderness in her lower-back.[33] He assessed her with lower-back strain, prescribed Naprosyn, and recommended rest with heat and cold application.[34]

In March, treating physician Dr. Dirk van Meurs reported that Ms. Osborn was complaining of back and neck pain, and that the Naprosyn was "not cutting it."[35] Ms. Osborn was "anxious and angry at times."[36] He diagnosed her with bacterial bronchitis, post-partum depression, and neck and lower-back pain.[37] He prescribed her Doxycycline, Prozac, baclofen, and tramadol.[38]

Treating physician Dr. Gary Pace reported in June that Ms. Osborn started having lumbar pain during her pregnancy in December, and that she was currently working as a caregiver for a quadriplegic woman.[39] He wrote that her pain has persisted since delivery, was mainly in the lumbar region, and occasionally radiated down her right leg.[40] Ms. Osborn claimed that work worsened her pain, and that she had not yet been x-rayed.[41] Ms. Osborn was trying Naprosyn, Tylenol, and baclofen.[42] The report said that Ms. Osborn was suffering from depression with some improvement, noting that her boyfriend moved out and she no longer used Prozac.[43] Dr. Pace's

---

[31] AR 435.

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] AR 436.

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] AR 437-38.

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

United States District Court
Northern District of California

prognosis parallels this: her depression was stable with chronic back pain since December.[44] For her back pain, Dr. Pace ordered x-rays and referred her to physical therapy.[45] Dr. Pace noted that "[Ms. Osborn] mainly want[ed] pain medication."[46] He opined that Ms. Osborn may have to "reconsider her current job situation, because working with her quadriplegic can be rare [sic] in her back."[47] After a long discussion on the downside of opiate usage, Dr. Pace prescribed her Vicodin with plans to reevaluate treatment after reviewing the x-rays in a week.[48] He further noted that "she may need to go on disability for a while and see [if] we can really get an aggressive rehab program going."[49]

Later in June Dr. Pace followed up with Ms. Osborn's back pain.[50] She had been x-rayed and off work since the 15th, a period of ten days.[51] She thought her back pain somewhat improved with unemployment, but "she does have an infant."[52] Ms. Osborn had two Vicodin left, and was interested in physical therapy.[53] Her lumbar pain continued to radiate down her right side.[54] Difficult movements caused her to freeze.[55] Dr. Pace noted "patient has a history of drug abuse," her last methamphetamine use was in November 2006, and she was in rehab.[56] He reported her depression was stable, and the x-rays showed degenerative changes.[57] He recommended physical therapy and an MRI.[58] He noted that Ms. Osborn would start receiving disability benefits on June

---

[44] AR 438.

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] AR 439-40.

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.*

United States District Court
Northern District of California

11th with a return date of September 1st.[59] After discussing pain medication, Dr. Pace suggested Ms. Osborn provide a urine toxicology screen.[60]  She reported that she would rather not take opiates.[61] Dr. Pace said that they would need a toxicology screen if any opiates were prescribed.[62] He continued her on tramadol, baclofen, and anti-inflammatories.[63] Her depression seemed stable.[64]

Ms. Osborn visited Redwood Regional Medical Group in July for a lumbar-spine MRI.[65] Non-examining physician Dr. David H. Schmidt compared her MRI with her Healdsburg lumbar-spine x-rays.[66] He reported disc desiccation and mild disc space narrowing of her L3-4 and L4-5; a small paracentral disc protrusion at L3-4; a small central protrusion at L4-5; mild thecal sac effacement with no demonstrated nerve root impingement; and mild broad-based disc bulging at L5-S1.[67]

Back at Alexander Valley, Dr. Pace's August notes showed Ms. Osborn was managing her pain through swimming and exercise.[68] The pain, however, was disrupting her sleep and barring her from grocery shopping.[69] The notes also referred to her difficulties with public transportation due to her "inability to sit on a bus for an hour and a half."[70] Dr. Pace reviewed and confirmed the July MRI findings.[71] He recommended she pursue physical therapy and chiropractic and acupuncture treatment.[72] He noted her stable depression.[73] He also commented that Ms. Osborn

---

[59] *Id.*

[60] AR 440.

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] AR 409, 413-14, 491.

[66] *Id.*

[67] *Id.*

[68] AR 440.

[69] *Id.*

[70] *Id.*

[71] AR 441.

[72] *Id.*

[73] *Id.*

was complacent with her state disability benefits, not involved in furthering her recovery through an active rehabilitation program, failed to pursue therapy, and "needs to get actively trying to improve [and] . . . get her work life on track."[74]

Ms. Osborn had no significant changes in September.[75] She was using ibuprofen, and her lumbar pain continued to radiate down her right leg into the knee.[76] She felt that she was unable to work because of the pain.[77] She was receiving chiropractic and acupuncture care, and had tried physical therapy, "but there has been some mix up in the scheduling."[78] The MRI showed some minor disc disease, and minor nerve root compression.[79] She was caring for her seven-month-old baby.[80] Dr. Pace observed her to be alert and in good spirits.[81] He continued her treatment with ibuprofen, and referred her to receive lumbar epidural steroid injections.[82] He also declared on a renewal-request form for state disability benefits that he was actively treating Ms. Osborn's chronic lumbar pain, and he estimated her recovery in three months.[83]

In October, treating physician Dr. Manuel Fernandez administered a smooth routine lumbar epidural steroid injection on Ms. Osborn, noting her "history of chronic low back pain and some right-sided buttock and upper thigh radicular pain."[84]

### 2.1.3  Medical records from 2008

Ms. Osborn required a second lumbar epidural steroid injection in February 2008 because the October injection's beneficial effects lasted until January (about four weeks earlier).[85] Dr.

---

[74] *Id.*

[75] AR 443.

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] AR 443, 428.

[83] AR 429.

[84] AR 477.

[85] AR 472.

United States District Court
Northern District of California

United States District Court
Northern District of California

Fernandez successfully administered this second injection with a post-procedure diagnosis of L3-4 and L4-5 degenerative-disc disease.[86]

Dr. van Meurs reported in August that despite her continued efforts to lose weight, Ms. Osborn's back pain worsened, and she wanted disability benefits again.[87] He observed her ability to heel-toe walk, and determined that obesity was exacerbating her lower-back pain.[88] He recommended she increase her weight-loss efforts.[89]

By November, Ms. Osborn suffered a "sudden pinching in her right buttock" and could not stand up without rolling onto all fours.[90] Dr. van Meurs diagnosed an exacerbation of her chronic lower-back pain.[91] He prescribed Prevacid, Vicodin, and a return to physical therapy.[92]

### 2.1.4  Medical records from 2009

In June 2009, Dr. van Meurs saw Ms. Osborn, who complained of lower-back pain and numbness in the right leg, and asked for prescription refills.[93] Dr. van Meurs noted that there was "no surgery in sight," and that Ms. Osborn was trying to lose weight.[94] He diagnosed her with severe exacerbation of her chronic lower-back pain, and he prescribed Percocet.[95]

Two months later, Dr. van Meurs reported that Ms. Osborn recently returned from Arizona, and was stressed because "her parents want[ed] her out."[96] He observed her to be alert and anxious with easy movement.[97] He diagnosed her with anxiety and depression, in addition to chronic

---

[86] *Id.*

[87] AR 425.

[88] *Id.*

[89] *Id.*

[90] AR 424.

[91] *Id.*

[92] *Id.*

[93] AR 421.

[94] *Id.*

[95] *Id.*

[96] AR 420.

[97] *Id.*

United States District Court
Northern District of California

lower-back pain exacerbated by obesity.[98] He prescribed her Percocet and Zoloft and recommended weight loss.[99] In October, he further prescribed Percocet and advocated for weight loss.[100]

Ms. Osborn had two medical visits in November. On the 10th, Dr. van Meurs noted that Ms. Osborn demanded a Percocet refill appointment notwithstanding her previous two no-show appointments, and that "she was very rude."[101] On the 12th, Ms. Osborn had her Percocet prescription refilled, was taking it appropriately, and her pain was stable.[102] Her depression was controlled at this point.[103]

### 2.1.5  Medical records from 2010

In January 2010, Ms. Osborn complained of lower-back pain and numbness down the back of her right thigh.[104] The Percocet no longer helped her, but "someone gave her a 10mg of oxy (?codone vs. contin?)," and she slept better.[105] Dr. van Meurs diagnosed progressive lower-back pain and radicular parethesis down her right leg.[106] He prescribed oxycodone, and referred her for a lumbo/sacral spine x-ray comparison.[107]

The lumbo/sacral spine x-ray was taken in February.[108] Non-examining physician Dr. Scott Lomax compared this latest x-ray with her June 22, 2007 x-ray.[109] He reported findings consistent with mild L4-5 and L5-S1 disc narrowing with no definitive changes since the previous x-ray.[110]

---

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] AR 419.

[102] *Id.*

[103] *Id.*

[104] AR 418.

[105] *Id.*

[106] *Id.*

[107] *Id.*

[108] AR 409, 490.

[109] *Id.*

[110] *Id.*

United States District Court
Northern District of California

In April, Ms. Osborn was upset because her boyfriend suddenly vanished.[111] She reported staying in bed a lot, and Dr. van Meurs observed her in an alert, tearful, and depressed state.[112] He diagnosed her with chronic back pain, grief, and depression.[113] He prescribed her "oxyco" and ordered a urine toxicology screen.[114]

Ms. Osborn's parents kicked her out in June and she was facing a lot of stress.[115] She was staying with a friend and doing okay with her boyfriend.[116] Her ex-boyfriend refused to return her child even though she claimed she stopped using drugs, but she did admit to drinking alcohol.[117] She asked for more pain medication, but her urine toxicology screen tested positive for amphetamines, methamphetamines, and MDMA/ecstasy.[118] Dr. van Meurs tried to explain to her that she should attend Alcoholics Anonymous and return in two weeks to re-test, but she was angry and left the clinic very upset when she was not prescribed her pain medication.[119] Dr. van Meurs diagnosed her with chronic back pain and psychosocial chaos.[120]

From July to December, Ms. Osborn received multiple ultrasound procedures for her third pregnancy.[121] In an Alliance health questionnaire, Ms. Osborn stated she had two Caesarean sections in 1997 and 2007, had stopped using drugs or alcohol, smoked five cigarettes a day, and was unemployed due to her back injury.[122] Nurse practitioner ("NP") Phillipa stated that Ms. Osborn had chronic back pain and was 21 weeks pregnant.[123]

---

[111] AR 417.

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] AR 416.

[116] *Id.*

[117] *Id.*

[118] *Id.*

[119] *Id.*

[120] *Id.*

[121] AR 485, 487, 489, 493, 495.

[122] AR 448.

[123] AR 447.

### 2.1.6  Medical records from 2011

Ms. Osborn had a string of emergency department visits from February to April 2011.[124] A wide range of medical issues were associated with these visits, including hemorrhoids, bronchitis, and abdominal pain associated with her third Caesarean section on March 9.[125] In February, she was thirty-five weeks pregnant, and had stabbing pain from hemorrhoids.[126] Examining physician Dr. Edward Wang prescribed her Anusol and suppositories.[127] On March 8, Ms. Osborn was thirty-eight weeks pregnant, and went in with a two-week cough.[128] Treating physician Dr. Lawrence Gettler diagnosed her with asthmatic bronchitis, and prescribed amoxicillin and albuterol.[129]

Later in March, Ms. Osborn complained of incisional pain from her Caesarean section the week prior.[130] She claimed increased activity led to a ripping sensation.[131] Her increased activity was due partly to Child Protective Services taking her child after she tested positive for methamphetamines.[132] The prescribed Vicodin was no longer controlling her pain, and her Caesarean doctor, Dr. Kachru, told her to get a pain shot at the emergency department.[133] Upon inspection of her Caesarean incision, treating physician Dr. Bruce Deas did not see anything to suggest wound infection or any other significant intra-abdominal process.[134] He opined that Ms. Osborn may have "overdone things," and had resulting pain. The pain shots helped, and Dr. Deas

---

[124] AR 453, 456, 459-60, 463, 467.

[125] *Id.*

[126] AR 467.

[127] *Id.*

[128] AR 463.

[129] AR 463-64.

[130] AR 459.

[131] *Id.*

[132] *Id.*

[133] *Id.*

[134] AR 460.

United States District Court
Northern District of California

1   prescribed her Percocet.[135] Ms. Osborn admitted to smoking, but denied further alcohol and

2   methamphetamine use.[136]

3       Dr. Gettler saw Ms. Osborn on March 31 for abdominal pain.[137] He recommended an

4   ultrasound, but she declined, stating that she did not have time for the scan due to her daughter's

5   dental appointment.[138] He prescribed her Vicodin instead.[139] In April, he saw Ms. Osborn again

6   for abdominal pain.[140] She requested and received more Vicodin.[141] He diagnosed her with

7   postoperative abdominal pain of uncertain etiology.[142]

8       Nurse Indiana Moreno saw Ms. Osborn the next month because, although Ms. Osborn was on

9   oxycontin before her pregnancy, she now wanted Vicodin.[143] Nurse Moreno referred her to urgent

10  care, because narcotic pain medication requests were inappropriate for walk-in patients.[144]

11      In May and June, Ms. Osborn received a computed topography ("CT") scan and a magnetic

12  resonance imaging ("MRI") scan at Redwood Regional Medical Group.[145] Examining physician

13  Dr. Frank Modic's CT scan revealed post-operative changes related to Ms. Osborn's recent

14  Caesarean section.[146] He concluded that there was a visible defect in the lower anterior uterine

15  wall, and three small postoperative fluid pockets in the vicinity likely to be seroma or

16  hematoma.[147] The MRI scan of Ms. Osborn's lumbar spine showed the following: (1) L3-4 small

17  central disc protrusion and annular tear; (2) L4-5 broad-based central disc protrusion producing

18

19  _____

    [135] *Id.*

20  [136] *Id.* 459.

21  [137] AR 456.

    [138] AR 57.

22  [139] *Id.*

23  [140] AR 453.

24  [141] AR 454.

    [142] *Id.*

25  [143] AR 446.

26  [144] *Id.*

27  [145] AR 483-84, 499.

    [146] AR 484.

28  [147] *Id.*

borderline central spinal stenosis; and (3) L5-S1 advanced degenerative-disc disease and broad-based disc bulging with questionable impingement upon the exiting right L5 nerve root (mild degenerative facet changes were also noted).[148]

Examining physician Dr. Marion-Isabel Zipperle, Ph.D. (of MDSI Physician Services) conducted a detailed psychiatric evaluation of Ms. Osborn's mental health in September 2011.[149] Dr. Zipperle's report contained the following remarks about Ms. Osborn's life situation: she drove herself to the meeting, and her chief complaints were back problems, bulging discs, sciatic nerves, ulcers, stress, depression, and anxiety.[150] She had a work injury, but did not receive workers' compensation because she did not think she could obtain it.[151] She has struggled with methamphetamine use, culminating with Child Protective Services taking her children.[152] "She became very depressed when her children were removed and suffers from depression."[153] "She is depressed every day and the medication does not work. She wants to get better."[154] She had low motivation and energy, had self-esteem and self-confidence issues, and felt worthless, helpless, and hopeless.[155] She had mood swings, racing thoughts, impulsivity, and poor judgment.[156] She had difficulty getting along with others and being grateful.[157] She had lost interest in enjoyable activities, and had become isolated, withdrawn, and emotional.[158] She was taking omeprazole, Celexa, and ibuprofen.[159] She mentioned seeing a therapist named "Annette" for depression.[160]

---

[148] AR 499.

[149] AR 502-05.

[150] AR 502.

[151] *Id.*

[152] *Id.*

[153] *Id.*

[154] *Id.*

[155] *Id.*

[156] *Id.*

[157] *Id.*

[158] AR 502-03.

[159] AR 503.

[160] *Id.*

United States District Court
Northern District of California

Dr. Zipperle included a detailed account of Ms. Osborn's family, social, and employment history: she had a good and supportive childhood from an intact family, and was a good student until she associated herself with drug-abusing classmates in the eighth grade.[161] Her work history was short due to depression and addiction problems, including eight years of cashier and in-home work.[162] She experienced a variety of legal troubles from methamphetamine use, grand theft, and driving under the influence.[163]

An account of Ms. Osborn's living situation showed her attempts to turn her life around ever since Child Protective Services took her children.[164] She had been living in a women's recovery home for three months, went to Narcotics Anonymous meetings, and had a sponsor.[165] She was working on getting her daughter back and had visitation rights.[166] She lived with a friend, was able to "do self-care," and complete light housework, but she could not "do heavy stuff like laundry or lifting things."[167] She had no hobbies due to her depression.[168] She could accomplish tasks, but had trouble remembering appointments and bills.[169]

A series of mental status tests showed Ms. Osborn had no deficits in her concentration, memory, abstract thinking, ability to draw comparisons, or judgment.[170] She also had good grooming, hygiene, manners, and eye contact.[171] Her attitude was quiet, agitated, and depressed, yet she spoke normally, coherently, and logically.[172] Her thoughts were generally negative due to

---

[161] *Id.*

[162] *Id.*

[163] *Id.*

[164] *Id.*

[165] *Id.*

[166] *Id.*

[167] *Id.*

[168] *Id.*

[169] *Id.*

[170] AR 504.

[171] *Id.*

[172] *Id.*

self-criticism and rumination over past mistakes.[173] Her mood was depressed, withdrawn, tearful, and emotional.[174] Dr. Zipperle diagnosed Ms. Osborn with bipolar disorder, polysubstance dependence in remission, self-defeating behavior, and mental health problems.[175]

Dr. Zipperle's functional assessment and medical source statement claimed Ms. Osborn's state of mind would result in moderate deficits in her ability to interact with others, especially coworkers, supervisors, and the general public in cooperative or competitive settings.[176] She further opined that Ms. Osborn "could understand and carry out simple and two[-]part instructions," and could manage complex tasks.[177] Dr. Zipperle noted that Ms. Osborn appeared to be a person who could learn and carry out simple new tasks in a typical work environment without additional or special supervision.[178] She may have issues with work-related stress, because "stress presses upon her mental health issues, her liability, and depression."[179] "She may have difficulty pacing herself in an eight-hour day as she can dress, and do self-care and some housework, but she has difficulty remembering appointments and everyday things."[180] She "may need the assistance of someone to help her with her funds."[181]

On September 18, 2011, examining physician Dr. John Alchemy, also of MDSI Physician Services, conducted an internal medicine evaluation of Ms. Osborn's physical health.[182] She had been living in a sober transitional facility since August 18.[183] He diagnosed her with chronic lower-back pain radiating to her right knee caused by a 2006 work injury.[184] He reviewed her

---

[173] *Id.*

[174] *Id.*

[175] *Id.*

[176] AR 505.

[177] *Id.*

[178] *Id.*

[179] *Id.*

[180] *Id.*

[181] *Id.*

[182] AR 509-13.

[183] AR 510.

[184] AR 513.

United States District Court
Northern District of California

MRI, and reported no objective findings of radiculopathy or nerve root compression.[185] His functional assessment concluded that because she had no postural difficulties, she had no condition that would impose limitations for twelve or more continuous months.[186]

Ms. Osborn visited Sutter Health's emergency room in October for more Vicodin.[187] Examining physician Dr. Edward Hard noted that Dr. Sheppard held off on giving her narcotics during a similar recent trip to the same emergency department in August.[188] When Dr. Hard asked her about this, she responded that she had stopped abusing narcotics, yet still wanted more Vicodin.[189] Dr. Hard noted that he was cautious about giving her additional narcotics if she really was in recovery.[190] Ultimately, Ms. Osborn did not receive her requested Vicodin, and was prescribed Toradol instead.[191] Dr. Hard advised against further narcotic refills in the emergency room.[192] He diagnosed her with lower-back strain, right hip sciatica, and moderate obesity at 225 pounds.[193]

By October, Ms. Osborn transferred from Alliance to Santa Rosa Community Health Centers, which marked the beginning of a lengthy treatment relationship with Nurse Practitioner ("NP") Laura McDonald.[194] NP McDonald analyzed and summarized her medical history: a lumbar-spine MRI showing degenerative-disc disease and some disc protrusion, a referral from Alliance for a neurosurgery consult, and good pain management with daily Vicodin.[195] She noted her history of methamphetamine abuse, and time spent at a women's treatment center in 2011 resulting in

---

[185] *Id.*

[186] *Id.*

[187] AR 551-52.

[188] AR 551.

[189] *Id.*

[190] AR 552.

[191] *Id.*

[192] *Id.*

[193] *Id.*

[194] AR 547-48.

[195] AR 547.

sobriety.[196] Ms. Osborn felt that, unlike oxycodone, Vicodin did not "wake up" her addiction.[197]

NP McDonald's screening showed that Ms. Osborn was negative for depression and anxiety.[198]

NP McDonald assessed lumbar back pain, depression, drug abuse in remission, and tobacco

abuse.[199] She referred Ms. Osborn to physical therapy, and encouraged weight loss and exercise.[200]

She also prescribed Vicodin for her lumbar back pain.[201]

NP McDonald followed up with Ms. Osborn's back pain twice in November and December.[202]

In November, she gave her more Vicodin for her lumbar back pain after a urine drug screen

showed her negative for everything.[203] Ms. Osborn was supposed to continue with exercise and

weight loss.[204] In December, Ms. Osborn had a new complaint of abdominal epigastric pain.[205] NP

McDonald gave her Omeprazole for her abdominal epigastric pain, and more Vicodin for her

lumbar back pain.[206]

### 2.1.7  Medical records from 2012

A January lumbar-spine MRI revealed that Ms. Osborn was suffering from the following

conditions: (1) L3-4 dehydrated disc and very mild narrowing, 3 mm right posterolateral

protrusion with annular fissure and crowding of the right subarticular gutter, and patent neural

foramina; (2) L4-5 subtle annular fissuring, a 3 mm broad-based protrusion and crowding of the

left ubarticular gutter, and facet capsular tissue and ligamentum flavum thickening; and (3) L5-S1

slight anterolisthesis across dehydrated mildly narrowed disc, a broad-based 3 mm protrusion and

---

[196] *Id.*

[197] *Id.*

[198] *Id.*

[199] *Id.*

[200] *Id.*

[201] *Id.*

[202] AR 544-46.

[203] AR 545.

[204] *Id.*

[205] AR 542-43.

[206] AR 543.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    subtle reactive endplate change suggesting motion segment instability, and moderately severe right

2    and moderate left up-down foraminal narrowing.[207] Non-examining Dr. Meghan Blake found no

3    significant changes when she compared this MRI to Ms. Osborn's June 22 MRI.[208] Ms. Osborn

4    stopped taking Vicodin that same month because it was "waking up" her addiction.[209] NP

5    McDonald noted that Ms. Osborn would deal with the pain without medication, and continue with

6    weight loss.[210] She was negative on a depression screening, and had a pleasant and alert general

7    appearance.[211]

8        Ms. Osborn had her initial neurosurgical consultation with UCSF treating physician Dr.

9    Jeffery Yablon in February.[212] He reviewed her diagnostic MRI, and reported degenerative-disc

10   disease at L3-4, L4-5 and L5-S1, with minimal stenosis at all levels, and a central protrusion

11   slightly acentric to the left at L4-5.[213] Her cervical and thoracic spines were normal.[214] Lumbar

12   examination also revealed unremarkable results: full range of motion with no tenderness or

13   spasms.[215] He found no evidence of any peripheral compressive neuropathy.[216] Neurological

14   testing showed a normal mental status, muscle bulk, and sensory function.[217] He observed minimal

15   difficulty with her gait and ability to heel-toe walk.[218] His overall assessment was that Ms. Osborn

16   was symptomatic from her three-level degenerative-disc disease, primarily at L4-5, and obesity.[219]

17   He ultimately opined that it was unwise to operate, and recommended weight loss or gastric

---

[207] AR 592-93.

[208] AR 592.

[209] AR 540-41.

[210] AR 540.

[211] *Id.*

[212] AR 577-79, 601-04.

[213] AR 577, 601.

[214] AR 578, 601-02.

[215] AR 578, 602.

[216] *Id.*

[217] *Id.*

[218] *Id.*

[219] *Id.*

bypass.[220] He informed her that if she lost 50 pounds and still had significant problems, he would consider a three-level fusion.[221]

A few months later, Family Nurse Practitioner ("FNP") Jeni Cooper saw Ms. Osborn for medication refills.[222] Ms. Osborn's pain increased in January and February when she started taking care of her young children.[223] Ms. Osborn had not started physical therapy yet due to "so much going on in life right [then,]" but stated that she could start in July after her classes ended.[224] FNP Cooper prescribed Ms. Osborn tramadol for her lumbar back pain, and noted that she needed to be involved in treating her pain via physical therapy, ice/heat application, lower-back stretches, and anti-inflammatory medications.[225]

The tramadol did not help Ms. Osborn's back pain, and she wanted to stop taking it.[226] She still had yet to attend physical therapy, citing difficulty in finding childcare, although her recent swimming in a friend's pool had beneficial results.[227] She also complained of right shoulder pain that began two weeks prior, but said she holds her baby on that side.[228] Regarding her obesity, she had been dieting and did not want gastric bypass surgery because she "[did not] want to lose too much [weight], [she had] seen friends with 'all that extra skin.'"[229] NP McDonald referred her to physical therapy for her back and shoulder pain.[230]

At the next follow-up appointment, Ms. Osborn had a new complaint of restless leg syndrome.[231] NP McDonald noted Ms. Osborn was signing up for the YMCA at the end of

---

[220] *Id.*

[221] *Id.*

[222] AR 584-85.

[223] AR 585.

[224] *Id.*

[225] AR 584.

[226] AR 582.

[227] *Id.*

[228] *Id.*

[229] *Id.*

[230] AR 583.

[231] AR 580-81, 659-60.

United States District Court
Northern District of California

October when she could afford it.[232] She observed her to be alert and oriented, with normal gait and balance.[233] She prescribed gabapentin for Ms. Osborn's restless leg syndrome.[234]

Ms. Osborn's weight loss was going well; she lost eleven pounds in November.[235] NP McDonald refilled her ibuprofen prescription, and started her on acetaminophen.[236] Ms. Osborn was still smoking, and the nurse recommended quitting to ease her ulcers and restless leg syndrome.[237] In December, she was actively trying to lose weight, and had lost two more pounds.[238] Her walking increased, and she could walk for about 60 minutes.[239] She could not sit for more than sixty to ninety minutes before her "back [would] start[] killing her."[240]

In December 2012, examining physician Dr. Jerilyn Jackson and NP McDonald co-signed a five-page lumbar spine residual-functional-capacity questionnaire detailing Ms. Osborn's physical limitations.[241] They diagnosed her with spinal stenosis of the lumbar region and radiculopathy.[242] They noted the following: the June MRI showed L4-5 spinal stenosis, L5-S1 advanced degenerative-disc disease, and impingement on the L5 nerve root.[243] Her symptoms included back pain radiating down her right leg, which affected her sleep and worsened with prolonged sitting or standing, and a reduced range of motion in forward flexion and extension secondary to pain.[244] Emotional factors did not contribute to her pain or limitations.[245] Her impairments were

---

[232] AR 580, 659.

[233] *Id.*

[234] AR 581, 660.

[235] AR 657.

[236] *Id.*

[237] *Id.*

[238] AR 655.

[239] *Id.*

[240] *Id.*

[241] AR 595-99.

[242] AR 595.

[243] AR 595-96.

[244] AR 596.

[245] *Id.*

reasonably consistent with the symptoms and functional limitations described in the residual-functional-capacity questionnaire.[246] In a typical workday her pain would frequently interfere with attention and concentration needed to perform simple work tasks.[247] The medical providers opined that her impairments lasted or could be expected to last at least twelve months.[248]

Ms. Osborn could walk two city blocks without rest or severe pain.[249] She could sit at one time for 30 minutes before needing to get up, stand twenty to thirty minutes before needing to sit or walk around, and sit less than two hours total and stand or walk around for about two hours total in an eight-hour working day.[250] Every thirty minutes she needed three to five-minute periods of walking around during an eight-hour working day.[251] She required a job that permits shifting positions at will from sitting, standing or walking, and she would sometimes need to take unscheduled breaks every hour for five minutes during an eight-hour working day.[252] Prolonged sitting meant her legs should be elevated thirty degrees for fifty percent of a sedentary eight-hour working day.[253] She does not need to use a cane or other assistive device with occasional standing or walking.[254]

In a competitive work situation, Ms. Osborn could lift and carry less than ten pounds frequently, ten pounds occasionally, twenty pounds rarely, and never fifty pounds.[255] She could never twist, crouch or squat, and could rarely stoop (bend) or climb ladders or stairs.[256] She did not have significant limitations with reaching, handling, or fingering.[257] Her impairments were

---

[246] *Id.*

[247] *Id.*

[248] *Id.*

[249] *Id.*

[250] AR 597.

[251] *Id.*

[252] *Id.*

[253] *Id.*

[254] *Id.*

[255] AR 598.

[256] *Id.*

[257] *Id.*

United States District Court
Northern District of California

likely to produce good days and bad days, and it was unknown if she would be absent from work

three or more days per month. The functional-capacity questionnaire concluded by listing 2006 as

the earliest date the described symptoms and limitations applied.[258]

### 2.1.8  Medical records from 2013

Ms. Osborn's other interaction with Dr. Jackson was in February, when she treated her for

heavy menstrual bleeding.[259] Dr. Jackson assessed her with menorrhagia, and prescribed

Provera.[260] She also assessed her with dysmenorrhea, and prescribed Vicodin.[261] Ms. Osborn was

pleasant, alert, and oriented.[262]

MDSI Physician Services' examining physician Dr. Farjallah Khoury conducted a consultative

neurological evaluation for Ms. Osborn's chronic back pain in March 2013.[263] He reviewed Ms.

Osborn's three lumbosacral MRIs to date: (1) July 2007, showing mild disc space narrowing and

disc protrusions at L3-4 and L4-5, with mild disc bulge at L5-S1; (2) June 2011, showing small

disc protrusions at L3-4 and advanced degenerative-disc disease at L5-S1; and (3) January 2012,

showing no significant changes compared to the previous scans.[264] He summarized her present-

illness history: "a 33-year-old former nurse who suffered a work related lifting injury while

attempting to transfer a patient in 2007, who presents today with continued chronic low back pain,

right-sided, progressively getting worse, now constant and severe, stabbing in quality [and]

radiating down the right leg to the toes. She has had multiple recent hospitalizations within the last

several months due to pain in her back status post intravenous opiate medications with relief of

symptoms. She is currently on oral opiates and anti-inflammatories with mild to moderate overall

relief, but does not have a home TENS unit. Her last epidural steroid injection course was in 2008

---

[258] *Id.*

[259] AR 650.

[260] *Id.*

[261] *Id.*

[262] AR 651.

[263] AR 620-24.

[264] AR 620.

United States District Court
Northern District of California

with mild to moderate relief of symptoms for approximately two months."[265] She had no recent physical therapy, chiropractic interventions, or acupuncture.[266] "She has associated spasms and lower limb instability during ambulation."[267] Her medications were Vicodin, Tylenol, and naproxen.[268] Her daily living activities included driving, self-caring, and completing light-duty house chores.[269] She has needed increased time to perform her daily living activities.[270]  She could move independently into the examination room, and sit down without assistance.[271] Dr. Khoury diagnosed her with right-sided lumbar radiculitis at L5-S1, gait abnormality, and obesity.[272]

His functional assessment was that Ms. Osborn's condition would continue to impose mild to moderate overall functional and work-related impairments.[273] She could stand or walk for a total of six hours in a regular workday with frequent breaks for stretching or rest, and could sit for a total of six hours in a regular day with frequent rest breaks.[274] She could lift or carry twenty pounds occasionally, and ten pounds frequently, secondary to her chronic pain and lumbar radiculitis.[275] Her postural activities were "occasionally climbing, balancing, stooping, kneeling, crouching, and/or crawling secondary to her chronic pain and lumbar radiculitis."[276] Her manipulative activities had "no relevant functional deficits that would restrict reaching, handling, fingering and/or feeling."[277]  As to her workplace environmental activities, Ms. Osborn should "only occasionally perform tasks associated with unprotected heights, operating heavy machinery,

---

[265] *Id.*

[266] *Id.*

[267] *Id.*

[268] AR 621.

[269] *Id.*

[270] *Id.*

[271] *Id.*

[272] AR 623.

[273] *Id.*

[274] *Id.*

[275] *Id.*

[276] AR 624.

[277] *Id.*

United States District Court
Northern District of California

working at extreme temperatures, chemicals, dust/fumes/gases, and around excessive noise."[278]

Dr. Khoury concluded that Ms. Osborn was "at a high fall risk secondary to her gait

instability/lumbar radiculitis."[279]

Later that month, NP McDonald had a follow-up appointment with Ms. Osborn due to a

snapping sensation in her back.[280] She had gone to the emergency room for evaluation, and asked

for another MRI.[281] She had been taking depression medication for four days; a depression

screening was administered but was negative.[282] NP McDonald diagnosed Ms. Osborn with

lumbar spinal stenosis, and major depression, single episode.[283] For her lumbar spinal stenosis, she

prescribed her oxycodone-acetaminophen, and ordered a diagnostic MRI.[284] She decreased her

venlafaxine prescription (used for depression) because of drowsiness.[285]

Ms. Osborn reported the Percocet's successful results to examining physician Dr. Anthony

Lim during her next follow-up on April 29, 2013.[286] It was working better than Norco and

Vicodin, but her two pills per day allotment were insufficient at times.[287] Dr. Lim increased her

Percocet allocation from two to three pills a day, and wrote that he would let NP McDonald decide

if more was needed.[288] The next month, examining physician Dr. Parker Duncan increased her

oxycodone/Percocet prescription from three to four pills a day.[289] In June, Ms. Osborn requested

an increase of oxycodone from four to five pills a day, with a new complaint of radiating pain into

United States District Court
Northern District of California

---

[278] *Id.*

[279] *Id.*

[280] AR 646-47.

[281] AR 646.

[282] *Id.*

[283] AR 647.

[284] *Id.*

[285] AR 646-47.

[286] AR 643.

[287] *Id.*

[288] AR 644.

[289] AR 640-42.

her upper back, shoulders, neck, and head.[290] NP McDonald granted this request, and ordered diagnostic MRIs for her cervical and thoracic spine.[291]

An MRI of Ms. Osborn's lumbar spine was taken in July, and Dr. Modic compared this with her June 2011 MRI.[292] He found the following. L1-2: normal; L2-3: normal; L3-4: degenerative-disc disease with loss of height and signal from intervertebral disc; stable small central disc protrusion with associated annular tear; L4-5: moderate degenerative-disc disease; central and right paracentral disc protrusion larger than the prior study affecting right lateral recess and displacing the traversing right L5 and S1 nerve roots with moderate central canal stenosis; and L5-S1: advanced degenerative-disc disease with a broad-based disc bulge; this extended into the inferior recess of the neural foramina bilaterally with flattening of the exiting right L5 nerve root.[293] He concluded that Ms. Osborn had (1) degenerative-disc disease in the lower lumbar spine; (2) enlarged disc protrusion at L4-5 with a greater impact on the spinal canal and the traversing nerve roots; and (3) significant degenerative-disc disease at L5-S1 with likely impingement on the exiting right L5 nerve root in the neural foramen.[294]

On June 22, 2013, Ms. Osborn had an MRI of her thoracic and cervical spine, both analyzed by examining physician Dr. Douglas Munro.[295] Regarding her thoracic spine, he saw some mild degeneration at the mid-disc, evidenced by loss of disc space height and decreased T2 signal, but no central spinal canal or neural foraminal compromise.[296] In general, the MRI showed an unremarkable thoracic spine.[297] Her cervical spine had C5-6 "disc degeneration with a mild disc bulge and mild osteophytic ridging," which "create[d] mild-to-moderate central spinal canal stenosis with equivocal cord effacement. Left uncovertebral osteophytosis [was] seen creating a

---

[290] AR 638-39.

[291] AR 639.

[292] AR 667.

[293] Id.

[294] Id.

[295] AR 668-69.

[296] AR 668.

[297] Id.

United States District Court
Northern District of California

small left neural foramen. The right neural foramen [was] patent."[298] She also had C6-7 "disc degeneration with a mild broad disc bulge and minimal osteophytic ridging," which "create[d] minimal central spinal canal stenosis. The neural foramina [were] patent."[299] The cervical-spine report concluded as follows: foramen magnum was widely patent; the cervical cord appeared unremarkable, the hemopoietic marrow signal was normal, and the bony structures and paravertebral soft tissues were felt to be normal. The "Impression" section showed "C5-6 disc bulge and osteophytic ridging creating mild-to-moderate central spinal canal stenosis with equivocal cord effacement"; and "C6-7 mild disc bulge creating minimal central spinal canal stenosis."[300]

By August 14, 2013, NP McDonald noted that Ms. Osborn was in terrible pain due to her recent hemorrhoidectomy.[301] She had already taken all of her prescribed Percocet and Norco.[302] NP McDonald temporarily increased her Percocet for surgery recovery, but noted that it would be reduced back to her usual amount the following month.[303] She also referred her to neurosurgery to evaluate her recent MRIs.[304] Her acute pain from the hemorrhoidectomy, however, continued into the next month.[305] Ms. Osborn went to the emergency room a few days after this latest appointment for back pain and a fever; she was diagnosed with pyelo and given Cipro and fluids.[306] She asked NP McDonald for something stronger than Norco, and she refilled her Percocet prescription at the previously increased amount.[307]

---

[298] AR 669.

[299] *Id.*

[300] *Id.*

[301] AR 689.

[302] *Id.*

[303] *Id.*

[304] AR 689-90.

[305] AR 687-88.

[306] AR 687.

[307] *Id.*

United States District Court
Northern District of California

1    After losing the "required 50 pounds," Ms. Osborn met with Dr. Yablon for a follow-up

2    neurosurgical consultation on September 16.[308] At the last neurosurgical evaluation, "her chief

3    complaint was of low back pain."[309] This time, her chief complaint was "of cervical pain radiating

4    down her left arm to all digits of her left hand."[310] He reported that this was "not associated with

5    weakness. There are paresthesias. There are no symptoms in the right upper extremity."[311] There

6    was no neck pain at the last evaluation, but Ms. Osborn "state[d] that the neck pain and left upper

7    extremity radicular symptoms ha[d] been present for the last 4 months."[312] In addition, she still

8    complained of lower-back pain radiating "down her right leg in a typical posterior lateral

9    distribution towards the foot. There are paresthesias. There is no weakness."[313] Her symptoms did

10   not increase with the Valsalva maneuver.[314]

11   Dr. Yablon reviewed her three recent MRIs and found the following. Her cervical MRI scan

12   showed bilateral degenerative changes at the uncovertebral joints at C5-6 and C6-7 with foraminal

13   stenosis.[315] Her thoracic MRI scan was normal.[316] Her lumbar MRI scan showed "mild disc-

14   degeneration at L3-4 and L5-S1[,] but at L4-5 she had a moderately large herniated disc centrally

15   into the right with foraminal and central stenosis."[317]

16   He conducted a physical examination of Ms. Osborn and found the following: there were

17   unremarkable mechanical signs in her cervical, thoracic, and lumbar spines; her mental status was

18   normal; she had no cranial nerve palsies; her muscle bulk, tone, and strength was normal; "sensory

19   testing [was] intact"; her deep tendon reflexes were all to seventy percent use in the left lower

20

---

21   [308] AR 691-92.

22   [309] AR 691.

23   [310] Id.

24   [311] Id.

25   [312] Id.

26   [313] Id.

27   [314] Id.

28   [315] Id.

     [316] Id.

     [317] Id.

United States District Court
Northern District of California

extremity, but her right knee and ankle jerks were absent; and she had minimally antalgic gait ambulation.[318]

Dr. Yablon's assessment and plan was as follows. Ms. Osborn was suffering from significant pathology in her cervical and lumbar spines, manifested as neck pain, left upper-extremity radiculopathy, low-back pain, and right lower-extremity radiculopathy.[319] As to her cervical spine, he did "not believe she has had adequate conservative therapy," and he recommended physical therapy and cervical epidural steroids.[320] If she failed to respond to this treatment, he would then consider her a candidate for two-level anterior cervical discectomy and fusion at the C5-6 and C6-7 levels.[321] "Regarding her thoracic spine, there [was] nothing to do."[322] As for her lumbar spine, Dr. Yablon gave her the option of either another set of lumbar epidural steroid injections, or surgery in the form of a minimally invasive right L4-5 hemilaminectomy and discectomy.[323]

In October, Ms. Osborn's hemorrhoidectomy pain had resolved, but she was having terrible sciatica.[324] She also had an epidural "that caused really bad pain," and she did not want another.[325] NP McDonald noted that she was trying to decide on neurosurgery to get the herniated disk repaired.[326] She also felt that she did not need Percocet for pain anymore, and instead wanted to stick with Norco for pain management.[327] Ms. Osborn also would like something for anxiety.[328] A urine drug screen showed her negative for everything except opiates.[329] NP McDonald refilled her

---

[318] AR 692.

[319] *Id.*

[320] *Id.*

[321] *Id.*

[322] *Id.*

[323] *Id.*

[324] AR 684-85.

[325] AR 684.

[326] *Id.*

[327] *Id.*

[328] *Id.*

[329] *Id.*

United States District Court
Northern District of California

1   Norco prescription, and warned her against utilizing the emergency room for acute pain

2   medication and early refill requests.[330] She also started her on hydroxyzine for anxiety.[331]

3        In November, Ms. Osborn awoke "with suddenly swollen legs," and went to the emergency

4   department "where she had a w/u that apparently didn't reveal anything."[332] Despite her attempts

5   to lose weight, she gained 20 pounds in the few weeks before this emergency visit.[333] Dr. James

6   Wu assessed her with acute swelling of an unclear etiology.[334] He prescribed her furosemide for

7   the swelling, and five days' worth of Percocet.[335]

8   **2.2  SSA Non-Examining Physicians**

9        **2.2.1  Initial claim for disability Drs. Robert C. Scott, M.D. & H. Pham, M.D.**

10        In October 2011, SSA non-examining Drs. Scott and Pham reviewed Ms. Osborn's medical

11   records, including the reports by Drs. Zipperle and Alchemy from MDSI Physician Group.[336]

12        Dr. Pham listed Ms. Osborn's Allegations of Impairments as "back problems/discs/pinched

13   sciatic nerve, pinched sciatica nerve, and ulcer/stress."[337] Dr. Scott found that Ms. Osborn suffered

14   from an affective disorder, and a substance-addiction disorder, that caused a mild restriction on

15   Ms. Osborn's daily activities, and moderate restrictions on her ability to maintain social function,

16   concentration, persistence, and pace.[338] Dr. Pham wrote that one or more of Ms. Osborn's

17   medically determinable impairments were reasonably expected to produce her pain or other

18   symptoms.[339] She also wrote that Ms. Osborn's statements about the intensity, persistence, and

19   functionally limiting effects of the symptoms were not substantiated by the objective medical

20

21   _____

    [330] *Id.*

22   [331] AR 685.

23   [332] AR 681.

    [333] *Id.*

24   [334] AR 682.

25   [335] *Id.*

26   [336] AR 111-13.

    [337] AR 115.

27   [338] AR 116.

28   [339] AR 117.

evidence alone.[340] Dr. Pham decided that the "ADLs" were most informative in assessing the credibility of Ms. Osborn's statements.[341] Dr. Pham assessed the credibility of Ms. Osborn's statements regarding symptoms considering the total medical and non-medical evidence as "partially credible."[342] She explained this credibility assessment as follows: Ms. Osborn's "abilities for functioning per ADL and functional accounts were not consistent with her alleged limitations due to mental impairment."[343] Dr. Pham gave both Drs. Zipperle and Alchemy's opinions "great weight," and explained this assessment as follows: "no TP opinions in file. CE MSS are consistent with other evidence in file."[344]

Dr. Pham completed a physical residual-functional-capacity assessment.[345] She rated Ms. Osborn's exertional limitations as follows.[346] She could occasionally (cumulatively 1/3 or less of an eight-hour day) lift and/or carry (including upward pulling) 50 pounds.[347] She could frequently (cumulatively 1/3 to 2/3 of an eight-hour day) lift and/or carry (including upward pulling) 25 pounds.[348] She could stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday.[349] She could sit (with normal breaks) for a total of about six hours in an eight-hour workday.[350] She could push and/or pull (including operation of hand and/or foot controls) "unlimited, other than shown, for lift and/or carry."[351]

---

[340] *Id.*

[341] *Id.*

[342] *Id.*

[343] *Id.*

[344] *Id.*

[345] AR 117-19.

[346] AR 118.

[347] *Id.*

[348] *Id.*

[349] *Id.*

[350] *Id.*

[351] *Id.*

United States District Court
Northern District of California

Dr. Pham also noted Ms. Osborn had postural limitations, and rated them as follows.[352] She was "unlimited" in climbing ramps/stairs, climbing ladders/ropes/scaffolds, balancing, kneeling, crouching, and crawling.[353] She was "frequently" limited in stooping.[354] Dr. Pham concluded that Ms. Osborn had no manipulative, visual, communicative, or environmental limitations.[355]

Dr. Scott completed the mental residual-functional-capacity assessment.[356] He noted Ms. Osborn had no understanding and memory limitations, and had sustained concentration and persistence limitations.[357] He rated her sustained concentration and persistence limitations as follows.[358] Her abilities to carry out very short and simple instructions and detailed instructions were not significantly limited.[359] Her abilities to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances were moderately limited.[360] She was not significantly limited in her ability to sustain an ordinary routine without special supervision, to make simple work-related decisions, to complete a normal workday and workweek without interruptions from psychologically based symptoms, or to perform at a consistent pace without an unreasonable number and length of rest periods.[361] Her ability to work in coordination with or in proximity to others without being distracted by them was moderately limited.[362] Dr. Scott explained her sustained concentration and persistence limitations above as "able to sustain a routine of simple tasks under ordinary supervision."[363]

---

[352] Id.

[353] Id.

[354] Id.

[355] Id.

[356] AR 119-20.

[357] AR 119.

[358] Id.

[359] Id.

[360] Id.

[361] Id.

[362] Id.

[363] Id.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dr. Scott also noted Ms. Osborn had social interaction limitations, and rated them as follows.[364] Her ability to interact appropriately with the general public was moderately limited.[365] Her abilities to ask simple questions or request assistance, to maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness were not significantly limited.[366] There was no evidence of limitations on her abilities to accept instructions and respond appropriately to criticism from a supervisor, or her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.[367] Dr. Scott explained her social interaction limitations above as "depression will limit her tolerance for social interaction, and will restrict her to low public contact settings. [She is] able to relate adequately to familiar coworkers and supervisors in superficial work-related contact."[368] Dr. Scott concluded by noting Ms. Osborn had no adaptation limitations.[369]

The Disability Determination Explanation finished by listing Ms. Osborn's past relevant work as a caregiver, with additional past work as a cocktail waitress, waitress, and cashier.[370] It went on to conclude that Ms. Osborn had the residual functional capacity to perform her past relevant work, which she could do as "actually performed."[371] "The evidence shows that [Ms. Osborn] has some limitations in the performance of certain work activities; however, these limitations would not prevent the individual from performing past relevant work as [a] caregiver."[372] Ms. Osborn was classified as "not disabled."[373]

---

[364] AR 119-20.

[365] AR 120.

[366] *Id.*

[367] *Id.*

[368] *Id.*

[369] *Id.*

[370] AR 120-21.

[371] AR 121.

[372] *Id.*

[373] *Id.*

### 2.2.2  Reconsideration request for disability: Drs. Helen C. Patterson, Ph.D. and Nathan Strause, M.D.

In March and April 2012, SSA non-examining Drs. Patterson and Strause reviewed Ms. Osborn's medical records.[374] In addition to the records reviewed for the initial claim, both SSA non-examining doctors also reviewed records from Vista Family Health Center.[375] The reconsideration report noted that the alleged impairments of back problems/discs/pinched sciatic nerve, pinched sciatica nerve, ulcer/stress, depression, and anxiety, were unchanged since her initial claim for disability.[376] It went on to note that no new physical or mental limitations had arisen since the last disability report, and that Ms. Osborn had not worked since then.[377]

Dr. Patterson completed the findings of fact and analysis of evidence.[378] She wrote that "Dr. Zipperle has established [a] pattern of forming extreme conclusions when compared with [the] balance of a record. Nothing in the [medical evidence record] preceding her [examination] shows evidence that [Ms. Osborn] has a bipolar disorder. [Ms. Osborn] alleges anxiety and depression, along with her physical allegations, but she has no history of treatment for a psychiatric disorder."[379] Dr. Patterson briefly summarized Ms. Osborn's history of methamphetamine abuse, discussions of depression with treating doctors, her claimed abstinence from drugs, a doctor's refusal to prescribe medication, and a meth-positive urine toxicology screen.[380] Thus, Dr. Patterson concluded that the medical evidence record "shows mood symptoms reported but in [the] context of active drug abuse."[381] Dr. Patterson noted that Ms. Osborn "entered a drug rehab program and is indicated to be living in [a] sober living facility."[382] She also wrote that since SSA non-examining Dr. Scott's review in October 2011, updated treating-source records "have shown

---

[374] AR 138-49. AR 150-61 is identical.

[375] AR 139-42.

[376] AR 138-39.

[377] AR 139.

[378] AR 143.

[379] *Id.*

[380] *Id.*

[381] *Id.*

[382] *Id.*

zero evidence of mood disturbance, despite the claimant having no treatment. On routine screenings at OVs for physical, [Ms. Osborn] has denied any mood disturbance symptoms."[383] The report concluded with the assertion that Ms. Osborn "appears to have improved over time and [is] maintaining abstinence from drugs. PRTF completed to indicated condition is currently non-severe."[384]

Next, Dr. Patterson reported that Ms. Osborn had the following medically determinable impairments: (1) "disorders of back-discogenic and degenerative" (primary priority, severe); (2) peptic ulcer (other priority, non-severe); (3) obesity (other priority, non-severe); (4) affective disorders (other priority, non-severe); and (5) substance addiction disorders (secondary priority, non-severe).[385]

Dr. Patterson determined affective disorders caused mild restrictions on Ms. Osborn's daily activities, and mild difficulties in maintaining social function, concentration, persistence, or pace.[386] Ms. Osborn had no repeated episodes of decompensation of extended duration.[387] Dr. Patterson additionally explained that "objective evidence shows substantial improvement since initial determination five months ago."[388] The listings considered were 12.04 affective disorders, 12.09 substance addiction disorders, and 1.04 spine disorders.[389]

Dr. Patterson completed the assessment of policy issues.[390] She reported that one or more of Ms. Osborn's medically determinable impairments could reasonably be expected to produce her pain or other symptoms.[391] She wrote that Ms. Osborn's statements about intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the objective medical

---

[383] *Id.*

[384] *Id.*

[385] AR 143-44.

[386] AR 144.

[387] *Id.*

[388] *Id.*

[389] AR 144-45.

[390] AR 145.

[391] *Id.*

evidence alone.[392] She considered the "ADLs" as most informative in assessing the credibility of Ms. Osborn's statements.[393] She assessed the credibility of her statements regarding symptoms considering the total medical and non-medical evidence as "partially credible."[394] She explained this credibility assessment as "[Ms. Osborn]'s abilities for functioning per ADL and functional accounts are not consistent with her alleged limitations due to mental impairment."[395]

She weighed Drs. Zipperle and Alchemy's opinions as "other weight."[396] She explained this as follows: Dr. Alchemy's "functional assessment is supported by his objecting findings. I assign him other [weight] because of MRI (2/1/2010) indicated evidence I feel some postural. Dr. Zipperle's report contains [diagnoses] and conclusions that have no objective support elsewhere in the record. Updated records from [primary care provider] show signs of active mood disorder. [Dr. Zipperle's] report is read but not given weight. No limitations."[397]

Dr. Strause conducted the physical residual-functional-capacity assessment.[398] He rated Ms. Osborn's exertional limitations as follows.[399] She could occasionally (cumulatively 1/3 or less of an eight-hour day) lift and/or carry (including upward pulling) 20 pounds.[400] She could frequently (cumulatively 1/3 up to 2/3 of an eight-hour day) lift and/or carry (including upward pulling) 10 pounds.[401] She could stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday.[402] She could sit (with normal breaks) for a total of more than six hours on a

---

[392] Id.

[393] Id.

[394] Id.

[395] Id.

[396] Id.

[397] Id.

[398] AR 146.

[399] Id.

[400] Id.

[401] Id.

[402] Id.

sustained basis in an eight-hour workday.[403] She could push and/or pull (including operation of hand and/or foot controls) "unlimited, other than shown, for lift and/or carry."[404]

Dr. Strause also noted Ms. Osborn had postural limitations, and rated them as follows.[405] She was "unlimited" in climbing ramps/stairs, and balancing.[406] She could never climb ladders/ropes/scaffolds.[407] She could occasionally stoop.[408] She was "frequently" limited in kneeling, crouching, and crawling.[409] Dr. Strause found that Ms. Osborn had no manipulative, visual, communicative, or environmental limitations.[410] He additionally explained that for both her Title II and Title XVI claims, "there is continuous [medical record evidence] from 2006 until the present continuously documenting her [lumbar-spine] condition. An RFC at the DLI would not be significant[ly] different from this RFC."[411] He went on to opine that even though the initial disability determination report from September 18, 2011 gave Ms. Osborn no limitations, "her back is persistent and subsequent MER indicates that her pain is reasonably controlled with Vicodin."[412] Not one MER since the previous claim and the CE report had adequately reported back, motor, or neurological evaluations.[413] However, three MRIs of Ms. Osborn's lumbar spine have been reported (2007, 2010, and 2011) which "all indicated [degenerative-disc disease], disc bulging, effacement of thecal sac and the most recent indicating advanced [degenerative-disc disease] with impingement of the L5 nerve root. This is strong objective data. This evidence supports her allegations over the period from 2006 until the present."[414]

---

[403] *Id.*

[404] *Id.*

[405] *Id.*

[406] *Id.*

[407] *Id.*

[408] *Id.*

[409] *Id.*

[410] AR 147.

[411] *Id.*

[412] *Id.*

[413] *Id.*

[414] *Id.*

United States District Court
Northern District of California

Dr. Strause noted that "although [Ms. Osborn's] [symptoms] are not always persistent she has had significant radicular [symptoms] and severe pain requiring significant narcotics and epidurals. Therefore [he] [felt] that some weight must be given to the alleged limitations reported at PCP visits and in function report (affected by medication suppressing her pain)."[415] He especially took into consideration the prolonged history of Ms. Osborn's condition.[416] His recommended limitations also included allowances for activities that "would potentially aggravate [Ms. Osborn's condition] by increasing pressures in the thecal sac, the documented abnormalities in the lumbar spine, the spinal cord, and the nerve roots."[417] Dr. Strause concluded by noting Ms. Osborn's "GI ulcer and stress GI problems do not indicate any limitations."[418]

As to Dr. Zipperle's opinion, Dr. Strause noted it was more restrictive than his findings by explaining that it "relies heavily on the subjective report of symptoms and limitations provided by [Ms. Osborn], and the totality of the evidence does not support the opinion. The opinion is without substantial support from other evidence of record, which renders it less persuasive. [The] opinion is an overestimate of the severity of [Ms. Osborn's] restrictions/limitations and based only on a snapshot of [her] functioning."[419]

Dr. Strause listed Ms. Osborn's past relevant work as caregiver, with additional past work as a cocktail waitress, waitress, and cashier.[420] He determined Ms. Osborn had the residual functional capacity to perform her relevant past work, which can be performed as "actually performed."[421] "The evidence shows that [Ms. Osborn] has some limitations in the performance of certain work activities; however, these limitations would not prevent the individual from performing past relevant work as [a] caregiver."[422] Ms. Osborn was again classified as "not disabled."[423]

---

[415] *Id.*

[416] *Id.*

[417] *Id.*

[418] *Id.*

[419] AR 148.

[420] *Id.*

[421] *Id.*

[422] *Id.*

United States District Court
Northern District of California

### 2.3  Initial Hearing Before the ALJ: January 17, 2013

Ms. Osborn, her non-attorney representative Dan McCaskell, and vocational expert Gene Jackson were all present before the ALJ at the initial hearing.[424] First, Mr. McCaskell confirmed that Ms. Osborn's alleged severe impairments were a lumbar condition, depression, anxiety, and obesity.[425] Next, Ms. Osborn was questioned and testified about how her impairments have affected her life in support of her disability claim.[426]

#### 2.3.1  Ms. Osborn's testimony

Ms. Osborn testified to the following: she was 221 pounds at the hearing, and recently lost 20 pounds in four months from walking and dietary changes.[427] She had three children — ages fifteen, five, and two — and they all moved back in with her parents.[428] She has received state disability in the past, but not workers' compensation.[429] She drove her kids to and from school five days a week, received her GED, and had not worked since December 1, 2006 due to her back pain "killing [her]."[430] Ms. Osborn was working as a caregiver for a quadriplegic woman when she bent over to turn the patient (while pregnant), stood up, and "felt [her] back stop and [she] couldn't move."[431] Her previous jobs were caregiving, waitressing, and cashiering.[432]

Ms. Osborn felt that, primarily, her back prevented her from working.[433] On good days, she could sit for thirty minutes, and then she has to get up and walk around for at least thirty minutes.[434] On bad days, it was ten to fifteen minutes of sitting, then ten to fifteen minutes of

---

[423] *Id.*

[424] AR 77.

[425] AR 84-85.

[426] AR 85-101.

[427] AR 85-86.

[428] AR 86-87.

[429] AR 88.

[430] AR 88-89.

[431] AR 89.

[432] AR 90-91.

[433] AR 91.

[434] *Id.*

United States District Court
Northern District of California

getting up and walking around.[435] Her right leg has become numb from a pinched nerve.[436] At the time of the hearing, she was only taking ibuprofen and Tylenol — no narcotics — because of her drug history.[437] May 10, 2011 marked her clean and sober date — including cigarettes — after multiple attempts at residential rehabilitation programs.[438] Since rehab she felt physically sore and mentally "not stable," but she was adjusting.[439] Her back hurt worse because she "used to use the meth as . . . medication."[440] She did feel healthier, but her medications were "not really" helping — they were not strong enough and Ms. Osborn felt "the same."[441]

  She was not taking any mental medication at the time of the hearing.[442] Ms. Osborn took Prozac in 2002 and Zoloft during her residential treatment but stopped because she did not like the way Prozac made her feel and Zoloft did not work.[443] She was also not receiving any other mental-health treatment at the time of the hearing, but had attended therapy in 2011 and 2012.[444] She stopped anxiety and depression therapy in 2011-12 "because [she] didn't feel [it] was helping [her] and [she] found a new therapist that [she was] thinking about seeing."[445] She has never been hospitalized for her mental health.[446]

  She had had no surgeries, but UCSF Dr. Yablon recommended that a new disc be put in after she lost weight.[447] Previous steroid injections have helped, but the second time "didn't help

---

[435] *Id.*

[436] AR 92.

[437] *Id.*

[438] AR 92-93.

[439] AR 93.

[440] *Id.*

[441] AR 93-94.

[442] *Id.*

[443] AR 94-95.

[444] AR 97.

[445] *Id.*

[446] *Id.*

[447] AR 95.

United States District Court
Northern District of California

because they nicked my spine."[448] This second injection made her "more paralyzed for a few days," but the first injection helped for a few months.[449] She "went to physical therapy in 2007 or 2008, and it wasn't helping."[450] She has also tried the back exercises her doctors told her to do before getting in and out of bed, but "they're just not helping anymore."[451] She does not need to use a splint or brace, and has never used a TENS unit or cane.[452]

She described the location of her pain as "all through [her] lower back, mainly from the middle to the right more. It shoots a stabbing pain down [her] right leg. [Her] whole right side from about [her] knee up on the side of the . . . [is] all tingly. At night and during the day it just pinches, pinches, stabs, stabs."[453] She was often in pain all day and night, disrupting and causing her to "barely sleep."[454] Reclining, putting her feet up, and "putting the heating pad" helped her pain.[455] Her depression and anxiety "doesn't really affect [her] too much."[456]

Her typical day included getting up at 6:30 a.m., making lunch for her kids, and sitting down while they got ready for school.[457] Her family would help her, and she would drive them to school two miles away.[458] She would then return to her parent's house, and "put [her] feet back up and pretty much watch TV."[459] On good days she gets up every half hour, and on bad days it was every ten or fifteen minutes of walking in circles around the kitchen and through the living room.[460] She had on average four bad days and three good days in a week.[461]

---

[448] AR 95-96.

[449] AR 96.

[450] *Id.*

[451] *Id.*

[452] AR 96-97.

[453] AR 97-98.

[454] AR 98.

[455] *Id.*

[456] *Id.*

[457] *Id.*

[458] AR 98-99.

[459] AR 99.

[460] AR 99.

United States District Court
Northern District of California

It became harder for her to put on her shoes.[462] She testified: "I can lift my left leg over my right leg just fine but my right leg doesn't want to bend over my left leg to tie my shoes. So then I have to bend over and stress my back out even worse on this side or ask my daughter or somebody to tie my shoe."[463] She could cook, she could not put laundry in, but could fold the laundry with time, and she could grocery shop as long as there was a shopping cart to lean on.[464] Outside of the home, she attended AA meetings about three times a week to "sit in the back and soak in the peace."[465] She would use her laptop, and had no hobbies or pets.[466] Her parents would help care for her youngest child during the day.[467] Finally, during an eight-hour period from 8:00 AM to 5:00 PM, she would spend at least four hours reclined.[468]

### 2.3.2  Vocational expert Mr. Gene Johnson's testimony

The ALJ first asked the vocational expert ("VE") to classify Ms. Osborn's past work.[469] He stated that Ms. Osborn was a cashier and waitress, both performed at light exertion level, and home attendant, performed at a medium exertion level.[470]

The ALJ then posed a hypothetical to the VE: whether an individual with the previous jobs described could continue to perform these jobs with Ms. Osborn's limitations to light work; never climbing ladders, ropes or scaffolds; occasional stooping; frequent kneeling, crouching and crawling; and requiring a sit/stand option for ten to fifteen minutes.[471] He answered that a home attendant's exertion level eliminated it from the outset, and the required sit/stand options eliminate

---

461 *Id.*

462 *Id.*

463 *Id.*

464 AR 99-100.

465 AR 100.

466 *Id.*

467 *Id.*

468 *Id.*

469 AR 102.

470 AR 102-03.

471 *Id.*

United States District Court
Northern District of California

cashiering and waitressing.[472] The ALJ then asked the VE whether this individual could perform any other work.[473] He answered that in the light category, the individual could be an assembler of small products, a school bus monitor, or a bench worker.[474] In the sedentary category, the individual could be a telephone order clerk or packing finishing operator.[475] He pointed out that all of these jobs would be subject to the sit/stand option, which was not provided for by the SSA's Dictionary of Occupational Titles.[476] The VE explained he was able to provide these answers through analysis of their job descriptions and requirements.[477]

The ALJ added a limitation to the hypothetical: in both light and sedentary work, the individual would require twenty percent time off for additional breaks beyond normal breaks in an eight-hour work day.[478] The VE was unable to provide potential work suitable with this added limitation.[479]

Mr. McCaskell changed the initial hypothetical from a sit/stand option to a sit/walk and asked the VE whether that individual would still be able to perform the aforementioned other work.[480] The VE responded that bus monitors, order clerks, and packing/coding operators would be unable to walk away from the workstation.[481]

The ALJ then changed her initial hypothetical to never climbing ladders, ropes or scaffolds; occasional stooping; frequent kneeling, crouching and crawling, with a sit/walk option for ten to fifteen minutes.[482] The VE was unable to provide any jobs available with these limitations.[483]

---

[472] AR 103-04.

[473] AR 104.

[474] *Id.*

[475] *Id.*

[476] AR 104-05.

[477] AR 105.

[478] AR 105-06.

[479] AR 106.

[480] AR 106-07.

[481] *Id.*

[482] AR 108.

[483] *Id.*

The ALJ concluded the hearing by stating that Ms. Osborn would be sent for a neurologist consultative examination with an updated medical record.[484]

### 2.4  Supplemental Hearing Before the ALJ: September 5, 2013

Ms. Osborn, Mr. McCaskell, and non-examining medical expert Dr. William Rack were all present before the ALJ at the supplemental hearing.[485] Mr. McCaskell informed the ALJ that Ms. Osborn had obtained three more MRIs of her cervical and lumbar spine for submission into evidence.[486] The ALJ responded that she would decide at the end of the hearing whether to keep the record open in consideration of the medical expert's testimony.[487] Ms. Osborn and Dr. Rack testified about her disability.

#### 2.4.1  Ms. Osborn's testimony

Ms. Osborn testified that she was living with her fiancé, his parents and sister, and her children.[488] She also said that she weighed 215 pounds.[489] Since the initial hearing, she had been put on an increased dosage of Percocet, and the "pain in [the] right side of [her] back is so bad now that [she was] limping around because it's going down [her] leg."[490] She discussed her recent MRIs with her doctors, who put in another referral for neurosurgical evaluation.[491] The Percocet helped on good days, but on bad days she required additional ibuprofen.[492]There had been no recommendation for surgery yet.[493] At the time of the hearing, she did not need for a cane or assistive device.[494] She started taking venlaxafine in February or March for her mental health

---

[484] *Id.*

[485] AR 39.

[486] AR 43.

[487] *Id.*

[488] AR 46.

[489] *Id.*

[490] AR 46-47.

[491] AR 47.

[492] *Id.*

[493] *Id.*

[494] *Id.*

United States District Court
Northern District of California

which had been helping "a little bit."[495] She was not receiving any other treatment, counseling, or therapy for her mental health, but her nurse wanted her to "get into therapy."[496] Ms. Osborn affirmed her sober date of May 10, 2011.[497] She described the location and feeling of her pain: "it's through my whole lower back, mostly on the right side. It's like a constant stabbing, stabbing, and when I move to walk . . . it's constantly down my right leg, like a stabbing all the way down. So now when I'm walking, it's like I can't even put weight on my right leg."[498] At night, she tried to sleep with ice, heat, and muscle rubs.[499] The pain has caused her depression and anxiety, and has affected her concentration but not her memory.[500] Ms. Osborn was feeling depressed due to her inability to help around the house and play with her kids.[501]

Her typical day comprised of standing and sitting for at least three-quarters or eight hours of the day, lying down with ice on her back, then standing and trying to walk.[502] Her fiancé accompanied her to the grocery store, and she had to hold onto the cart.[503] Her fiancé did the laundry and "deal[t] with the kids," but she still made their lunch.[504] Her fiancé took them to school and helped her shower.[505] She could start washing dishes for five minutes, but then her mother-in-law would finish them.[506] She started attending paralegal school two nights a week for three hours per night.[507] But her back problems and a recent unrelated surgery forced her to

---

[495] AR 48.

[496] *Id.*

[497] AR 48-49.

[498] AR 49.

[499] *Id.*

[500] AR 49-50.

[501] AR 50.

[502] *Id.*

[503] *Id.*

[504] AR 50-51.

[505] AR 51.

[506] *Id.*

[507] AR 51-53.

occasionally leave class early.[508] She alternated between sitting and standing against a wall during class.[509]

### 2.4.2  Medical expert Mr. William Rack's testimony

First, the medical expert ("ME") informed the ALJ that he had only reviewed Ms. Osborn's medical records dating to February 2010 with some undetailed historical information regarding her lower-back treatment dating to February 2008, including an epidural injection.[510] He noted that there was only "a single line indicating [Ms. Osborn] had symptoms dating back to 2006," without any significant history of neurological examination.[511] The ME was aware of these time periods only from a historical perspective and without significant information or examination.[512]

Next, he stated that Ms. Osborn's primary impairment, from a neurological point of view, was lower-back pain associated with degenerative changes of an osteoarthritic and disc nature.[513] She also suffered associated discomfort into the right, lower extremities which, for a long time, was intermittent, but now appeared constant.[514] Despite this problem from a symptom point of view, "there ha[d] not been substantial neurologic abnormality described, per examination," meaning no atrophy, reflex changes, or consequential losses of strength or sensation.[515] He pointed out that Ms. Osborn's problem did not meet the UCSF neurosurgeon's criteria for referring her for surgery in February 2012.[516] Historically, on the basis of Ms. Osborn's statements, her condition worsened with constant, right, lower extremity pain, and she had difficulty in maintaining her upright posture because her symptoms.[517]

---

[508] *Id.*

[509] *Id.*

[510] AR 55-56.

[511] AR 56.

[512] *Id.*

[513] AR 57.

[514] *Id.*

[515] *Id.*

[516] AR 58.

[517] *Id.*

United States District Court
Northern District of California

1    The ME testified that the neurologic aspect was complicated by her poly-substance abuse,

2    bipolar disorder, depression, anxiety, and obesity (but noted her recent weight loss).[518] The ME

3    could not comment on her psychological or substance-abuse status, but he opined that her back

4    problem stemmed from mechanical disturbances in her back, namely osteoarthritic and

5    degenerative-disc disease.[519] He said "[t]here has not been any distinction [between the]

6    neurologic abnormality associated with these symptoms which is, [in his opinion], the reason that

7    a conservative course of action has been undertaken over this period of time."[520] He went on to

8    opine that if the upcoming neurological assessment presented abnormalities, or pain is at a

9    sufficient magnitude to warrant a different approach, then that would make a big difference (from

10   the disability point of view).[521] The ME acknowledged that the MRI studies have been abnormal,

11   and that a repeat study and report would be important and helpful.[522]

12   The ALJ asked him whether Ms. Osborn's impairments met or equaled any impairment

13   described in the SSA's Listings of Impairments.[523] He responded that prior to the hearing, he

14   believed the absence of neurologic deficits — despite the presence of back discomfort and

15   complicating factors from the poly-substance abuse — meant she did not meet the impairment

16   criteria listed in Section 1.04 of the SSA's Listing of Impairments.[524] But Ms. Osborn's worsening

17   pain (in light of her recent weight loss), increasing difficulty getting around, and the "acute

18   assessment" made him lean towards concluding that she met the listed criteria.[525] An assessment

19   in six months would be reasonable, particularly concerning the neurosurgical opinion.[526]

20

21

_____

22   [518] *Id.*

23   [519] *Id.*

24   [520] AR 58-59.

      [521] AR 59.

25   [522] *Id.*

26   [523] *Id.*

      [524] AR 60.

27   [525] *Id.*

28   [526] *Id.*

United States District Court
Northern District of California

1    The ALJ then asked him to clarify whether Ms. Osborn equaled listing 1.04 or needed further

2    assessment.[527] The ME responded that "it is much closer at this point to equaling 1.04," and that

3    he would "feel much more comfortable making that judgment knowing what the recent MRIs have

4    shown, and knowing what the neurosurgeon finds and thinks."[528] The ME was at the time unable

5    to cite to any specific neurological evidence in the record showing Ms. Osborn's impairments

6    equaled the listed criteria, and highlighted that everything was "really being based on a history of

7    pain without there being objective findings, as far as the neurologic examination is concerned."[529]

8    But, as mentioned above, her worsening pain and capabilities made him lean towards concluding

9    that her impairments equaled the listing.[530]

    Moving on to functional and manipulative limitations, the ME testified that Ms. Osborn's

10   functional limitations would restrict her to the sedentary level of activity.[531] Her manipulative

11   limitations included significant restrictions in bending, twisting, turning, crawling, kneeling, or

12   any non-sedentary use of her lower-back and extremities.[532] She should also refrain from

13   considerable leg use because "it's very difficult to do anything with your legs, particularly your

14   hips if, in fact, your back . . . [has] a problem."[533] It would be okay to use her feet in a limited

15   way.[534] He opined that there would not be restrictions on her upper extremities, shoulders, head, or

16   neck so long as they did not necessitate motion in the lumbosacral region.[535] She could lift things

17   from table height, but should not bend at all to lift anything from the ground or necessitates

18   bending her low-back.[536] She could infrequently climb stairs and ramps with handholds.[537] She

19

20   _____

21   [527] Id.

22   [528] AR 61.

23   [529] AR 62.

24   [530] Id.

25   [531] AR 63.

26   [532] AR 63-64.

27   [533] AR 64.

28   [534] Id.

     [535] Id.

     [536] Id.

     [537] AR 65.

should never climb ladders, ropes, or scaffolds, but could occasionally stoop, kneel, crawl, or couch.[538] The ME clarified that "occasionally" meant on the lower side of up to one third of a day.[539] She should also never be at unprotected heights, or be subject to vibration, but he did not object to her being in contact with hazardous materials or varying temperatures.[540] When asked to cite specific evidence supporting these opinions, the ME cited the medical record in general, including references to Ms. Osborn's MRIs, x-rays, and epidural injections.[541]

The ALJ asked him how far back Ms. Osborn's current limitations extended.[542] He could not extend her limitations back to 2006 or 2010 because he didn't "have any good information back to that time," and only felt comfortable going back to her February 2012 UCSF neurological assessment "which [was] really the first detailed assessment that she has had done, from an examination point of view, indicating how much [of a] problem[,] or lack of [a] problem[,] [was] present."[543]

Mr. McCaskell questioned the ME about Ms. Osborn's MRIs that showed evidence of motion segment instability and antalgic gait.[544] He did not think that those were major findings compared to an actual loss of reflex or strength in a particular group of muscles, or loss of sensation in a particular area.[545] He clarified that he had no argument with the MRI studies, but that they were not indicative of whether neurologic abnormalities were present on examination.[546] The ME explained that "[t]he presence of MRIs [as] not an indication of whether there are neurologic changes in the patient. MRIs are an indication that there are changes within the bony structure but not necessarily if there are associated neurologic changes. Those are found on examination of the

---

[538] Id.
[539] Id.
[540] AR 65-66.
[541] AR 66-67.
[542] AR 67.
[543] Id.
[544] AR 69-70.
[545] AR 70.
[546] Id.

United States District Court
Northern District of California

patient."[547] The ME concluded by stating that the most important thing was not that the MRIs —

were abnormal (which he conceded), but rather "the neurologic examination of [Ms. Osborn] by a

sophisticated neurologist or neurosurgeon . . . as to whether she has changed and whether there are

positive findings now that would indicate something more aggressive has to be done to treat

her."[548] Mr. McCaskell confirmed that the upcoming UCSF neurological examination would be

most important to the ME.[549]

The ALJ concluded the hearing by stating that she would leave the record open for a month to

allow submission of the latest MRIs and any additional evidence.[550] She also stated that the ME

would answer interrogatories to update his opinions after reviewing the additional evidence.[551]

Finally, the ALJ noted that the previous hearing's VE hypotheticals did not reflect exhibit 18F, the

consultative neurological examination with Dr. Khoury, or the ME's recent testimony.[552]

Therefore, new hypotheticals would need to be propounded by interrogatory.[553]

## 2.5  The ALJ's Administrative Findings

On December 4, 2013, the ALJ held that Ms. Osborn was not disabled from December 1, 2006

through the decision date.[554] She first noted that the record was left open after the supplemental

hearing on September 5, 2013.[555] No additional evidence was received by the agreed-upon

deadline, nor was there a request for additional time.[556] The ALJ closed the record "long after the

deadline" and based her decision on the record as of the date of the supplemental hearing.[557] The

---

[547] AR 70-71.

[548] AR 71-72.

[549] AR 72.

[550] AR 72-74.

[551] AR 74-75.

[552] AR 75.

[553] *Id.*

[554] AR 32.

[555] AR 23.

[556] *Id.*

[557] *Id.*

ALF proceeded through the five steps for determining whether Ms. Osborn was disabled under the Social Security Act.

At step one, the ALJ found that Ms. Osborn had not engaged in substantial gainful activity since December 1, 2006.[558]

At step two, the ALJ found that Ms. Osborn had the following severe combinations of impairments: degenerative-disc disease, osteoarthritis, and obesity.[559] Her back pain, exacerbated by obesity, limited her ability to perform basic work activities.[560] Her physical impairments thus were severe.[561] Her mental impairments of anxiety and depression — treated as one — did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities, and were therefore non-severe.[562] In making this finding, the ALJ considered the following four broad functional areas of mental disorder evaluation set by the SSA Listing of Impairments' disability regulations (known as the "paragraph B" criteria): (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation.[563]

For activities of daily living, the ALJ found no limitation because of Ms. Osborn's ability to independently self-care and complete housework.[564] The only activity affected by her depression was her enjoyment of hobbies.[565]

For social functioning, Ms. Osborn had no limitation due to her ability to cohabitate with a friend.[566] The ALJ noted that her children were taken, but due to drug abuse and not depression.[567]

---

[558] AR 26.

[559] *Id.*

[560] *Id.*

[561] *Id.*

[562] *Id.*

[563] *Id.*

[564] *Id.*

[565] *Id.*

[566] *Id.*

[567] *Id.*

United States District Court
Northern District of California

For concentration, persistence or pace, Ms. Osborn had no limitation.[568] The ALJ considered Dr. Zipperle's consultative psychiatric evaluation and bipolar diagnosis, but ultimately gave it little weight.[569] This was because the record as a whole did not support the diagnosis because no other treating or examining source gave a similar diagnosis.[570] Also, the ALJ reasoned, Dr. Zipperle's own examination showed no problems with memory, calculations, or concentration.[571] Ms. Osborn presented herself at the consultative examination in a "depressed, withdrawn, tearful, emotional state of mind," which caused Dr. Zipperle to predict that she would have problems getting along with others.[572] But the ALJ said that there was no evidence that a treating source ever observed her to be in such an emotional state, and that Ms. Osborn's demeanor at the hearing was not consistent with Dr. Zipperle's observations.[573] Accordingly, the ALJ gave Dr. Zipperle's opinion little weight.[574]

The ALJ did not find any episode of decompensation "of extended duration."[575] Because Ms. Osborn's medically determinable mental impairments caused no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, the ALJ found them to be non-severe.[576]

At step three, the ALJ found no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.[577] She found that Ms. Osborn's spine impairment did not meet or equal Section 1.04 of the Listing of Impairments because there was no evidence of nerve root compression, spinal arachnoiditis, or lumbar spine stenosis.[578]

---

[568] *Id.*

[569] *Id.*

[570] *Id.*

[571] *Id.*

[572] *Id.*

[573] *Id.*

[574] *Id.*

[575] AR 27.

[576] *Id.*

[577] *Id.*

[578] *Id.*

United States District Court
Northern District of California

The ALJ then considered Ms. Osborn's residual-functional-capacity, finding that she could perform sedentary work with limitations of (1) occasionally climbing ramps and stairs; (2) never climbing ladders, ropes or scaffolds; (3) occasionally stooping, kneeling, crawling, and crouching; and (4) never working at unprotected heights or with vibrations.[579] In making this finding, the ALJ considered (1) all symptoms and the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, and (2) opinion evidence.[580] She followed a two-step process in which it must be determined (1) whether there was an underlying medically determinable physical or mental impairment that could be reasonably expected to produce Ms. Osborn's pain or other symptoms, and if so then (2) evaluate the intensity, persistence, and limiting effects of Ms. Osborn's symptoms to determine the extent to which they limit her functioning.[581] For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of statements based on a consideration of the entire case record.[582]

The ALJ included testimony from Ms. Osborn at both hearings regarding her back injury, pain, and treatment.[583] She injured her back while working as a caregiver in December 2006, and had not worked since then.[584] She was unable to work due to back pain that limited her ability to sit, stand, and walk.[585] She had good days when she was able to sit for thirty minutes at a time, and walk for 30 minutes at a time.[586] She also had bad days when she was able to sit and walk for ten to fifteen minutes at a time, and spent up to four hours sitting in a recliner with a heating pad.[587]

---

[579] Id.

[580] Id.

[581] AR 27-28.

[582] AR 28.

[583] Id.

[584] Id.

[585] Id.

[586] Id.

[587] Id.

United States District Court
Northern District of California

She testified that she was not taking any pain medications due to a history of drug abuse prior to rehabilitation in 2011.[588] She stopped taking Prozac because she did not like how she felt when taking it, and she stopped taking Zoloft because it did not work.[589] She reported feeling healthier without medications, despite increased soreness and mental instability.[590] Her depression did not affect her functioning.[591] Her typical day included getting her children ready for school, making lunches, taking them to school, cooking, doing laundry, and grocery shopping.[592] She depended on her parents to assist her on bad days, which occurred four times per week.[593] She also attended Narcotic Anonymous meetings three times per week, and spent time on the computer.[594] She had been unable to work due to lower-back pain, which she described as "constant stabbing."[595] She alleged that the pain made it difficult to move her right leg, therefore she limped when walking.[596] She further alleged that the pain caused concentration problems.[597] She testified that she spent her day managing her pain by applying ice, and that her fiancé and his mother reportedly did all of the household chores.[598] She was studying to be a paralegal, and attended classes two nights per week for three hours each night.[599] She spent most of the time at school sitting, and was able to stand if necessary.[600]

United States District Court
Northern District of California

---

[588] Id.

[589] Id.

[590] Id.

[591] Id.

[592] Id.

[593] Id.

[594] Id.

[595] Id.

[596] Id.

[597] Id.

[598] Id.

[599] Id.

[600] Id.

The ALJ considered written statements from Ms. Osborn's father describing the extent of her daily living capabilities, and found them generally credible.[601] The ALJ found that Ms. Osborn's medically determinable impairments could reasonably be expected to produce her alleged pain and symptoms, but found her statements concerning the intensity, persistence and limiting effects of those symptoms not entirely credible.[602] There were objective findings that established the presence of a severe spine impairment, but there were no corresponding neurological deficits.[603]

The ALJ cited the following evidence in the record that she found to weigh against Ms. Osborn's credibility.[604] Ms. Osborn "has avoided going to physical therapy because she is too busy."[605] A treating source advised in 2007 that she "needs to get actively trying to improve and to get her work life on track."[606] It was noted in 2008 that she was "not very involved in getting better."[607] In 2012, Ms. Osborn was advised that she needed to be involved with treating pain via physical therapy, everyday ice/heat application and lower-back stretches, and anti-inflammatory medication.[608] She was also advised that losing 50 pounds would likely eliminate her back pain, yet she declined gastric bypass surgery because she did not want to lose too much weight and look like her friends who had "all that extra skin" after losing weight.[609] Her credibility in alleging chronic pain was eroded by drug-seeking behavior.[610]

The ALJ noted three MRI reports showing abnormalities at multiple levels of the spine.[611] She also noted Ms. Osborn's February 2012 evaluation by a UCSF neurosurgeon, whose findings upon

---

[601] *Id.*

[602] *Id.*

[603] *Id.*

[604] AR 28-29.

[605] *Id.*

[606] AR 29.

[607] *Id.*

[608] *Id.*

[609] *Id.*

[610] *Id.*

[611] *Id.*

United States District Court
Northern District of California

physical examination were normal.[612] No treatment was prescribed, and weight loss was recommended.[613] A September 2011 internal medicine evaluation by non-examining Dr. Alchemy, who opined that Ms. Osborn had no functional limitations, failed to account for MS. Osborn's subjective complaints of pain.[614] Accordingly, the ALJ gave this opinion little weight.[615]

In December 2012, Ms. Osborn's primary care provider NP McDonald completed a lumbar spine residual-functional-capacity form that listed her functional and postural limitations.[616] The ALJ found NP McDonald's opinion as "not a medical source opinion."[617] Although it was co-signed by Dr. Jackson, there was no evidence that she ever treated Ms. Osborn except for one visit in February 2013 when Ms. Osborn complained of menstrual problems and seasonal allergies.[618] The ALJ noted that this visit occurred after the residual-functional-capacity form was completed, and that Dr. Jackson did not co-sign any of NP McDonald's treatment notes.[619] In addition, the ALJ noted that the form reflected Ms. Osborn's symptoms and limitations were present in 2006, even though the treatment period indicated began in October 2012.[620] The ALJ found this to suggest that the form was completed based on Ms. Osborn's own statements as to the nature and extent of her symptoms and limitations, and accordingly gave the opinion little weight.[621]

In March 2013, Ms. Osborn underwent a neurological evaluation by examining Dr. Khoury.[622] He noted that Ms. Osborn complained of constant, severe, stabbing pain for which she has had no recent treatment except for pain relief (intravenous opiate medications) obtained in the emergency

---

[612] Id.

[613] Id.

[614] Id.

[615] Id.

[616] Id.

[617] Id.

[618] Id.

[619] Id.

[620] Id.

[621] Id.

[622] Id.

United States District Court
Northern District of California

room, and oral opiates/anti-inflammatories.[623] The only significant abnormalities observed upon physical examination were antalgic/abnormal gait and decreased sensation.[624] Dr. Khoury listed Ms. Osborn's functional, postural, and manipulative limitations, and noted her high fall risk secondary to her gait instability/lumbar radiculitis.[625] He also indicated that Ms. Osborn was limited to occasional exposure to unprotected heights, operating heavy machinery, working at extreme temperatures, working with chemicals/dusts/fumes/gases, and working around excessive noise.[626] The ALJ gave his opinion great weight.[627]

The ALJ addressed the ME's testimony that there was no question of abnormalities in her MRI reports, but that such abnormalities were expected considering her age and weight.[628] The ME explained that it was important to correlate the MRI findings with neurological findings, and that the MRI findings were not as important as the neurological findings.[629] The ME reported that both Dr. Yablon and Dr. Khoury detected no positive neurological findings upon physical examination.[630]

In analyzing Ms. Osborn's drug-seeking behavior, the ALJ considered notes from various doctors and nurses in the medical record.[631] She considered Ms. Osborn's concern that narcotic pain medications would "awaken" her drug addiction, when she left a clinic after being asked for a urine sample for drug testing, when she declined opiates after being informed that a urine test would be requested, and her referral to AA in 2010 after a positive urine toxicology screen.[632] The ALJ noted that after going through drug rehabilitation in 2011, Ms. Osborn was controlling her

---

[623] *Id.*

[624] *Id.*

[625] AR 29-30.

[626] AR 30.

[627] *Id.*

[628] *Id.*

[629] *Id.*

[630] *Id.*

[631] *Id.*

[632] *Id.*

pain with exercise and ibuprofen through March 2013 when she went to the emergency room and was prescribed Percocet.[633] Her primary care provider had prescribed additional and increased pain medications, but no other treatments.[634] Drug screening was ordered, but there was no evidence as to the results.[635]

State agency medical consultants reviewed Ms. Osborn's case file, and determined she was able to perform work at the medium level of exertion and had no mental impairments.[636] The ALJ found their mental assessment as consistent with the record as a whole, but gave their physical assessments little weight because the record was updated with new evidence indicating greater impairment than before.[637]

In reconciling NP McDonald's notes — which indicated the existence of severe chronic back pain and significant physical limitations — with the opinions from Drs. Yablon, Khoury, and the ME, the ALJ found that the specialists' opinions were entitled to greater weight.[638] The ME explained that the absence of neurological findings was a relevant indicator as to the severity of Ms. Osborn's impairment.[639] The ALJ noted that Ms. Osborn's primary care physicians have continued to prescribe pain medications despite her "refusal to cooperate with the requirements of urine testing."[640] Prior to March 2013, when Ms. Osborn resumed taking pain medications, she reported walking for exercise for sixty minutes at a time and her plans to join the YMCA when she could afford to do so.[641] The ALJ found that this demonstrated ability to control her pain with exercise "erodes the credibility of her prior and subsequent requests for pain medications, with no

---

[633] *Id.*

[634] *Id.*

[635] *Id.*

[636] *Id.*

[637] *Id.*

[638] *Id.*

[639] *Id.*

[640] *Id.*

[641] *Id.*

United States District Court
Northern District of California

corresponding changes in her symptoms or her physician's findings."[642] In sum, the ALJ found that the residual-functional-capacity assessment was supported by the ME's testimony, which was given great weight based on his professional qualifications, knowledge of the requirements for disability evaluation under the Social Security Act and Regulations, his familiarity with the record as a whole, and his specific references to evidence from the treating sources.[643]

At step four, the ALJ found that Ms. Osborn was unable to perform any past relevant work.[644] The VE testified that her past relevant work as a cashier, waitress, cook, and home attendant were all performed above the sedentary level of exertion.[645] Accordingly, Ms. Osborn was unable to perform past relevant work.[646]

At step five, in considering Ms. Osborn's age, education, work experience, and residual-functional-capacity, the ALJ found that there are jobs that exist in significant numbers in the national economy that Ms. Osborn could perform.[647] The ALJ found that Ms. Osborn's inability to (1) perform more than occasional climbing of ramps and stairs; (2) to climb ladders, ropes, and scaffolds; and (3) to perform more than occasional stooping, kneeling, crawling, and crouching did not have a significant impact on the occupational base of sedentary jobs that she was otherwise able to perform.[648] Similarly, the ALJ found that "Ms. Osborn's need to avoid working at unprotected heights or with [sic] has only a minimal effect on her ability to perform sedentary occupations."[649] The ALJ concluded that, considering Ms. Osborn's age, education, work experience, and residual-functional-capacity, she was capable of making a successful adjustment to other work that existed in significant numbers in the national economy.[650] The ALJ therefore

---

[642] *Id.*

[643] *Id.*

[644] *Id.*

[645] *Id.*

[646] *Id.*

[647] AR 31.

[648] AR 32.

[649] *Id.*

[650] *Id.*

United States District Court
Northern District of California

found that Ms. Osborn was "not disabled" — as defined in the Social Security Act — from December 1, 2006, through the decision date of December 4, 2013.[651]

# ANALYSIS

## 1. Standard of Review

District courts have jurisdiction to review any final decision of the commissioner if the claimant initiates the suit within sixty days of the decision. 42 U.S.C. § 405(g). District courts may set aside the commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation omitted). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *See id.* at 1039-40; *Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).

## 2. Applicable Law

An SSI claimant is considered disabled if he suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)3(A) & (B).

### 2.1 Five-step analysis to determine disability

There is a five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520. The five steps are as follows:

---

[651] *Id.*

**Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

**Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

**Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four**. Considering the claimant's residual functional capacity ("RFC"), is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the economy: (1) by testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2. *See* 20 C.F.R. § 404.1520(a)(4)(v).

For steps one through four, the burden of proof is on the claimant. *Tackett*, 180 F.3d at 1098. At step five, the burden shifts to the commissioner. *Id.*

### 3. Application

Ms. Osborn alleges that the ALJ erred in "rejecting" Dr. Zipperle's medical opinion, NP McDonald and Dr. Jackson's co-authored lumbar spine residual-functional-capacity form, and Ms. Osborn's testimony.[652] The court begins by clarifying that the ALJ did not "reject" any of the

---

[652] *See generally* Motion for Summary Judgment — ECF No. 14.

United States District Court
Northern District of California

1   foregoing evidence, but rather accorded the medical opinions "little weight" and deemed Ms.

2   Osborn's testimony less credible after consideration.[653]

3

4   **3.1  The ALJ Did Not Err by Giving Little Weigh to Dr. Zipperle's Medical Opinion**

5   Social Security regulations distinguish three types of physicians: treating physicians;

6   examining physicians; and non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v.*

7   *Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more

8   weight than an examining physician's, and an examining physician's opinion carries more weight

9   than a reviewing physician's." *Hollohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing

10  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). The opinion of a treating physician is given

11  the greatest weight because the treating physician is employed to cure and has a greater

12  opportunity to understand and observe a claimant. *See Smolen v. Chater*, 80 F.3d 1273, 1285 (9th

13  Cir. 1996).

14  In determining whether a claimant is disabled, the ALJ must consider each medical opinion in

15  the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *Zamora v.*

16  *Astrue*, No. C 09-3273 JF, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010). "If a treating

17  physician's opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic

18  techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will

19  be given] controlling weight.'" *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (quoting 20

20  C.F.R. § 404.1527(d)(2)). "If a treating physician's opinion is not given 'controlling weight'

21  because it is not 'well-supported' or because it is inconsistent with other substantial evidence in

22  the record, the [Social Security] Administration considers specified factors in determining the

23  weight it will be given." *Id*. "Those factors include the '[l]ength of the treatment relationship and

24  the frequency of examination' by the treating physician; and the 'nature and extent of the

25  treatment relationship' between the patient and the treating physician." *Id*. (citing 20 C.F.R. §

26  404.1527(b)(2)(i)-(ii)). "Additional factors relevant to evaluating any medical opinion, not limited

27

28  ───────────────
    [653] AR 26, 29, 31.

United States District Court
Northern District of California

1    to the opinion of the treating physician, include the amount of relevant evidence that supports the

2    opinion[,] . . . the quality of the explanation provided[, and] the consistency of the medical opinion

3    with the record as a whole; the specialty of the physician providing the opinion . . . ." *Id*. (citing 20

4    C.F.R. § 404.1527(d)(3)-(6)). Nonetheless, even if the treating physician's opinion is not entitled

5    to controlling weight, it still is entitled to deference. *See id*. at 632 (citing SSR 96-02p at 4 (Cum.

6    Ed. 1996)). Indeed, "[i]n many cases, a treating source's medical opinion will be entitled to the

7    greatest weight and should be adopted, even if it does not meet the test for controlling weight."

8    (SSR 96-02p at 4 (Cum. Ed. 1996)).

9        Accordingly, "[i]n conjunction with the relevant regulations, [the Ninth Circuit has] developed

10   standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of

11   Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). "To reject [the]

12   uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing

13   reasons that are supported by substantial evidence." *Id.* (quotation and citation omitted). "If a

14   treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may

15   only reject it by providing specific and legitimate reasons that are supported by substantial

16   evidence." *Id.* (quotation omitted). Opinions of non-examining doctors alone cannot provide

17   substantial evidence to justify rejecting either a treating or examining physician's opinion. *See

18   Morgan v. Comm'r of Soc. Sec. Admin*, 169 F.3d 595, 602 (9th Cir. 1999). An ALJ may rely

19   partially on the statements of non-examining doctors to the extent that independent evidence in the

20   record supports those statements. *Id.* Moreover, the "weight afforded a non-examining physician's

21   testimony depends 'on the degree to which they provide supporting explanations for their

22   opinions.'" *See Ryan*, 528 F. 3d at 1201 (quoting 20 C.F.R. § 404.1527(d)(3)).

23       Ms. Osborn argues that the ALJ, in rejecting Dr. Zipperle's lone bipolar diagnosis, arbitrarily

24   substituted her own judgment for a competent medical opinion, played doctor and made her own

25   independent medical findings.[654] The Commissioner argues that the ALJ was not diagnosing Ms.

26

27

---

28   [654] *Id.* at 9.

United States District Court
Northern District of California

1   Osborn but rather "validly pointing out that Dr. Zipperle's assessment finds no other support in the

2   longitudinal medical evidence[.]"[655] The court agrees with the Commissioner.

3       First, Dr. Zipperle is an examining doctor, although she saw Ms. Osborn only once.[656] Second,

4   non-examining Drs. Patterson and Strause both separately contradicted Dr. Zipperle's opinion.[657]

5   They opined that Dr. Zipperle's diagnosis formed extreme conclusions unsupported by the

6   medical record as a whole.[658] Third, the ALJ provided specific and legitimate reasons supported

7   by substantial evidence: no other treating or examining medical source ever diagnosed bipolar

8   disorder; Dr. Zipperle's own report showed Ms. Osborn's proficiency in memory, calculations,

9   and concentration; and Ms. Osborn's hearing demeanor which was inconsistent with Dr.

10  Zipperle's observations.[659] Fourth, non-examining doctor opinions did not provide the only

11  substantial evidence that the ALJ used in giving Dr. Zipperle's bipolar diagnosis little weight.[660]

12  Finally, evidence in the record supports the ALJ's theory that the opinion is an outlier in the

13  medical record, and the court may not substitute its judgment for that of the ALJ.[661]

14      A similar recent ruling from this district affirmed an ALJ's decision to reject a psychiatrist's

15  opinion because it was not supported by any other evidence in the record. *Smith v. Colvin*, No. 14-

16  CV-05082-HSG, 2015 WL 9023486, at *8 (N.D. Cal. Dec. 16, 2015). The plaintiff in that case

17  "did not report any symptoms of depression to her treating physicians and denied feeling

18  depressed when asked [by a care provider,]" and "testified that she was not receiving any

19  treatment for mental health issues." *Id.* Here, Ms. Osborn consistently denied having depression

20  symptoms to NP McDonald during their many routine check-ups.[662] At the initial ALJ hearing she

21  testified that she was on Prozac in 2002, on Zoloft during residential treatment, and dropped

22

23  [655] Cross-Motion for Summary Judgment — ECF No. 23, at 3.

    [656] AR 502-05.

24  [657] AR 143, 147-48.

25  [658] *Id.*

    [659] AR 26.

26  [660] *Id.*

27  [661] AR 143, 147-48.

28  [662] AR 143, 540, 547, 646.

therapy in 2011 or 2012.[663] She also testified, however, that no doctor prescribed mental-health medication since the Prozac and Zoloft were stopped, she was no longer on any mental health medication, she was not receiving any mental health treatment, and she had never been hospitalized for her mental health.[664] The court finds that the ALJ did not diagnose Ms. Osborn, "play doctor," or make her own independent medical findings. She simply pointed out the substantial lack of medical evidence corroborating the bipolar diagnosis.

Ms. Osborn's next argument — that Dr. Zipperle's mental-status examination, which showed no problems with memory, calculations, or concentration, actually supports the bipolar diagnosis — is not convincing. As the Commissioner argues, Dr. Zipperle seemed to exceed Ms. Osborn's own allegations regarding her mental health and limitations.[665] The lack of problems with memory, calculations, or concentration found by Dr. Zipperle can be contrasted with her finding of moderate limitations with social interaction, work related stress, and pacing difficulties. There is substantial evidence in the record supporting this: Ms. Osborn testified that her back pain was the only pain preventing her from working, she was not taking any mental-health medications or receiving any mental health treatment, she had never been hospitalized for her mental health, and her depression and anxiety "doesn't really affect [her] too much."[666] Ms. Osborn did not personally claim severe mental limitations, and yet Dr. Zipperle still diagnosed her with bipolar disorder.[667]

Ms. Osborn contends that "mental impairments are underreported and undertreated" (citing *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)).[668] She further argues that there is evidence in the record showing depression symptoms.[669] Even if both were true, they are not

---

[663] AR 94, 97.

[664] *Id.*

[665] Cross-Motion for Summary Judgment at 5.

[666] AR 91, 94, 97, 98.

[667] *See* AR 502-05.

[668] Motion for Summary Judgment at 15.

[669] *Id.*

United States District Court
Northern District of California

1    dispositive on the existence of a mental impairment. Additionally, Ms. Osborn testified that her

2    back pain was the only pain preventing her from working, she was never hospitalized for her

3    mental health, she discontinued treatment for the same, and it did not affect her greatly.[670]

4        Ms. Osborn argues that the ALJ substituted her own judgment and "play[ed] doctor" again by

5    using her observations of Ms. Osborn's hearing demeanor in rejecting Dr. Zipperle's opinion.[671]

6    Observations about demeanor are not inappropriate. Moreover, as discussed above, evidence in the

7    record supports the ALJ's conclusion that Dr. Zipperle's opinion is an outlier in the medical

8    record and that other evidence in the record was inconsistent with a bipolar diagnosis.[672] The court

9    may not substitute its judgment for that of the ALJ.

10       Ms. Osborn also contends that the ALJ failed to provide "legally sufficient reasons" for

11   rejecting Dr. Zipperle's opinion.[673] The Commissioner argues that Dr. Zipperle "appears to have

12   reached her conclusions based on [Ms. Osborn's] subjective symptom presentation . . . [and] . . .

13   seemed to accept many of [Ms. Osborn's] claims."[674] The ALJ explained the same: that Ms.

14   Osborn presented herself in a "depressed, withdrawn, tearful, emotional state of mind" which

15   caused Dr. Zipperle to predict her difficulty getting along with others.[675] The SSA doctors raised

16   identical concerns: that Dr. Zipperle relied on subjective complaints and the bipolar disorder is

17   unsupported by the medical record.[676] Again, the court may not substitute its judgment for the

18   ALJ's.

19       "The ALJ need not accept the opinion of any physician, including a treating physician, if that

20   opinion is brief, conclusory, and inadequately supported by clinical findings." *Thomas v.*

21   *Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). First, the ALJ is not required to provide "legally

22

23   _____

24   [670] AR 91, 94, 97, 98.

     [671] Motion for Summary Judgment at 10-11.

25   [672] AR 26.

26   [673] Motion for Summary Judgment at 17.

     [674] Cross-Motion for Summary Judgment at 5.

27   [675] AR 26.

28   [676] AR 145, 147-48.

United States District Court
Northern District of California

sufficient reasons" for disregarding a brief, conclusory, and inadequately supported physician opinion. *See id.* (quotations added); *see also Sivilay v. Comm'r of Soc. Sec.*, 32 Fed. App'x 911, 913-14 (9th Cir. 2002) (ALJ correctly rejected a psychiatrist's opinion based on (1) the psychiatrist's reliance on the claimant's subjective complaints rather than clinical observations, and (2) the inconsistency between the clinical diagnosis and the treatment notes). Second, Dr. Zipperle's opinion is brief, conclusory, and not supported by clinical findings. Apart from a few observations about Ms. Osborn's appearance, the opinion mostly comprises of medical conclusions reached from a single psychiatric evaluation based on self-reporting. For example, she concluded that Ms. Osborn "became very depressed when her children were removed and suffers from depression . . .[,] [s]he is depressed every day . . .[, and] [s]he also has mood swings . . . [and] problems getting along with other people."[677]

The court acknowledges the presence of depression, anxiety, and symptoms of mental instability in Ms. Osborn's medical record.[678] Dr. Patterson opined that these occurrences were attributable to problems stemming from Ms. Osborn's then-active drug abuse.[679] She also noted sobriety (starting in May 2011) brought improvement and an absence of mood disturbance.[680]

In sum, the record as a whole supported the ALJ's conclusion.

### 3.2  The ALJ Erred in Giving Little Weight to NP McDonald and Dr. Jackson's Co-Authored Lumbar Spine Residual-Functional-Capacity Form

Ms. Osborn argues that the ALJ erred by not crediting the treating opinion of Dr. Jackson and NP McDonald reflected on the lumbar spine residual-capacity questionnaire.[681] The ALJ rejected the nurse practitioner's opinion because she is not an accepted medical source, and she found no evidence that Dr. Jackson treated Ms. Osborn, save for one visit in February 2013.[682] As support,

---

[677] AR 502

[678] AR 50, 417, 420, 436-38, 450-51.

[679] AR 143.

[680] *Id.*

[681] Motion for Summary Judgment at 19–21.

[682] AR 29.

1    the ALJ pointed to Dr. Jackson's failure to sign NP Jackson's other treatment notes.[683] The ALJ

2    also noted that the form reflected Ms. Osborn's symptoms and limitations from 2006, but the

3    treatment period did not begin until October 2011.[684] The ALJ concluded that this suggests that

4    the form was completed based only on Ms. Osborn's own statements about her limitations and

5    thus gave the form little weight.[685]

6         The ALJ's conclusion is belied by the form itself, which gives a detailed basis for the

7    diagnosis (including an MRI), leads with Dr. Jackson's name on page one, and ends with her

8    signature (and NP McDonald's).[686] There is no basis in the record to ignore the opinion of a

9    treating physician.

10        Moreover, NP McDonald worked at Vista Family Health Center with Dr. Jackson.[687] She had

11   a prolonged treatment history with Ms. Osborn. Even if she alone is not an acceptable medical

12   source and instead is an "other source" that the ALJ may reject with some reasons, those reasons

13   do not exist in the administrative record. *See* 20 C.F.R. § 404.1502; *Britton v. Colvin*, 787 F.3d

14   1011, 1013 (9th Cir. 2015) (citing *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012)). For

15   example, an ALJ may accord less weight to a nurse practitioner's notes if they are based on the

16   plaintiff's self-reports rather than her independent, objective medical opinion. *See Koepke v.*

17   *Comm'r of Soc. Sec. Admin.*, 490 F. App'x 864, 866 (9th Cir. 2012).

18        That is not the case here. The questionnaire is complete, signed by Dr. Jackson, and is based

19   on (1) an MRI showing an L4-L5 spinal stenosis, L5-L1 advanced DDD, and an impingement on

20   the L5 nerve root; and (2) positive objective signs, such as reduced range of motion.[688] It is

21   consistent with previous MRIs and medical evidence from 2011 and 2012 (as summarized above).

22

23

24   _____
[683] *Id.*

25   [684] *Id.*

26   [685] *Id.*

27   [686] AR 595-99.

[687] AR 599

28   [688] AR 595-96.

1    In sum, given the extensive treatment history, the bases for the diagnoses (including an MRI

2    and objective signs), and Dr. Jackson's obvious participation in the questionnaire, the ALJ's

3    conclusion that there was no relationship between NP McDonald and Dr. Jackson is not supported

4    by the record. The court therefore remands the case because the ALJ did not credit the co-authored

5    opinion.

6    ### 3.3  The ALJ Erred By Not Crediting Ms. Osborn's Testimony

7        An ALJ must not reject a claimant's pain testimony supported by "objective medical evidence

8    of an underlying impairment . . . based solely on a lack of medical evidence to fully corroborate

9    the alleged severity of pain." *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (citing *Bunnell*

10   *v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991)). An ALJ may take into account "ordinary

11   techniques of credibility evaluation," including reputation for truthfulness and inconsistencies in

12   testimony. *Id.* Additional factors that the ALJ may consider include: (1) the nature, location, onset,

13   duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors

14   (e.g., movement, activity, environmental conditions); (3) type, dosage, effectiveness, and adverse

15   side-effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5)

16   functional restrictions; and (6) the claimant's daily activities. *Id.* (citing *Bunnell*, 947 F.2d at 346).

17       Ms. Osborn argues that the ALJ improperly rejected her testimony due to a lack of objective

18   medical findings even though her MRIs showed spinal abnormalities.[689] The court agrees. The

19   ALJ rejected Ms. Osborn's testimony based on her previous drug-seeking behavior, and instances

20   when Ms. Osborn has not been active in her recovery.[690] The ALJ did not identify inconsistencies

21   in Ms. Osborn's testimony, or a reputation for untruthfulness.[691] There is substantial objective

22   medical evidence that shows an underlying impairment, and supports Ms. Osborn's pain

23   testimony. Treating physician Dr. Pace referred Ms. Osborn for two lumbar epidural steroid

24   injections for pain relief.[692] Treating physician Dr. Fernandez, who administered these epidural

---

[689] *Id.* at 19.

[690] AR 28-29.

[691] *Id.*

[692] AR 443, 428.

United States District Court
Northern District of California

injections, post-procedurally diagnosed Ms. Osborn with degenerative-disc disease.[693] Non-examining physician Dr. Schmidt found disc desiccation, mild disc space narrowing, disc protrusions, and disc bulging in her 2007 MRI.[694] Non-examining physician SSA Dr. Strause opined that her three MRIs (2007, 2010, and 2011) all indicated at least degenerative-disc disease, disc bulging, and nerve root impingement, opining that "this is strong objective data" that "supports [Ms. Osborn's] allegations over the period from 2006 until the present."[695] The assessment by Dr. Jackson and NP McDonald supports the conclusion, too. And the ALJ acknowledged herself that "there are objective findings that establish the presence of a severe spine impairment."[696] Accordingly, the court finds that the ALJ erred in discrediting Ms. Osborn's testimony.

## CONCLUSION

Ms. Osborn's motion for summary judgment is granted in part and denied in part, and the Commissioner's cross-motion for summary judgment is granted in part and denied in part. The case is remanded for further proceedings consistent with this order.

This disposes of ECF Nos. 14 and 23.

**IT IS SO ORDERED.**

Dated: October 17, 2016

_____

LAUREL BEELER
United States Magistrate Judge

[693] AR 472.

[694] AR 409, 413-14, 491

[695] AR 147.

[696] AR 28.